**Case No. 22-55063**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ISLAND INDUSTRIES, INC., *et al.*,

*Plaintiff-Appellee,*

v.

SIGMA CORPORATION, *et al.*,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
L.T. Case No. 2:17-cv-04393-RGK-KS

## BRIEF OF APPELLANT
## SIGMA CORPORATION

Michael L. Yaeger
CARLTON FIELDS, P.A.
405 Lexington Avenue, 36th Floor
New York, New York 10174
Telephone: (212) 785-2577

Joseph H. Lang, Jr.
CARLTON FIELDS, P.A.
4221 W. Boy Scout Boulevard
Suite 1000
Tampa, Florida 33607
Telephone: (813) 229-4253

*Attorneys for Appellant*
*Sigma Corporation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Sigma Corporation ("Sigma") hereby files this corporate disclosure statement. Sigma, a New Jersey corporation, is a wholly owned subsidiary of Sigma Companies International Corporation ("SCI"), a Delaware registered company. Two companies, Odyssey Reinsurance Company and United States Fire Insurance Company, each own more than 10% of SCI's stock.

Date: June 2, 2022

CARLTON FIELDS, P.A.

s/ *Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.

*Attorneys for Appellant*
*Sigma Corporation*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Sigma believes that this appeal is particularly well-suited for oral argument. This case involves the novel issue whether a claim under the False Claims Act fails as a matter of law when the United States Department of Commerce expressly rules that, under the applicable statute and regulation, antidumping duties are not owed on entries predating October 30, 2020. Sigma asserts that, in the absence of an "obligation" to pay the Government money, there cannot be any False Claims Act claim or any damages thereunder.

Moreover, pursuant to *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), and its progeny, Sigma could not act "knowingly" because its actions were consistent with an objectively reasonable interpretation of the relevant antidumping duties order, and it was not warned away from that interpretation by any authoritative guidance. Therefore, as a matter of law, scienter could not be established.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT ..............................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF CONTENTS..................................................................iii

TABLE OF AUTHORITIES ...............................................................vii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT....................................................... 3

ISSUES PRESENTED ...................................................................... 4

STATEMENT OF THE CASE ............................................................. 5

    A.    Statement of the Facts............................................................. 5

        1.    Background ...................................................................... 5

        2.    The 1992 antidumping order and liquidation ............... 5

        3.    Sigma's entry packets..................................................... 6

        4.    The 2018 scope inquiry by Commerce............................ 8

        5.    The Court of International Trade ruling ..................... 10

        6.    The Remand Results ..................................................... 11

    B.    Course of relevant proceedings in the district court ........... 13

STATUTORY AND REGULATORY BACKGROUND............................ 18

STANDARD OF REVIEW.................................................................. 21

# TABLE OF CONTENTS
(continued)

*Page*

SUMMARY OF THE ARGUMENT ........................................................... 22

ARGUMENT ............................................................................................... 24

I.  The Remand Results establish that Sigma is entitled to judgment as a matter of law. ............................................................ 24

    A.  As a matter of law, Sigma did not submit a false record or statement material to an obligation to pay or transmit money or property to the Government. ................................. 24

        1.  A reverse FCA claim requires that the defendant have an actual, specific, and current legal obligation to pay the Government. ................................ 24

        2.  The alleged legal obligation here did not arise from the FCA itself, but from U.S. antidumping law. ......... 26

        3.  Under U.S. customs law, Commerce is responsible for issuing antidumping orders. ................................... 27

        4.  Commerce has determined it will not retroactively assess antidumping duties on welded outlets entered before the initiation of the scope inquiry. ...... 28

        5.  There is no obligation under the FCA to pay antidumping duties that Commerce has determined it cannot retroactively assess. .................. 31

    B.  As a matter of law, the Government did not sustain any damages. ................................................................................... 36

        1.  Damages cannot include antidumping duties Commerce has determined that it cannot not assess. .......................................................................... 36

# TABLE OF CONTENTS
(continued)

*Page*

      2.    Regulations in effect years before this case began prevented Commerce from assessing pre-inquiry antidumping duties. ...................................................... 37

      3.    Even if pre-inquiry antidumping duties had been owed at the time of entry, because they are not currently owed they are not damages. ......................... 38

II.    Sigma's statements that no antidumping duties were owed were objectively reasonable and Sigma is also entitled to judgment as a matter of law on that basis. .................................... 39

III.    Sigma's description of its products did not create a viable basis for liability under the FCA and, in the alternative, the product misdescription theory cannot sustain the final judgment under this Court's law relating to general verdicts. ..... 46

    A.    Sigma's Rule 50(b) motion should have been granted on the basis that no reasonable jury could have found falsity, scienter, or materiality in relation to Sigma's decription of its products in its duty entry packets. ............. 48

    B.    Island's product misdescription theory cannot sustain the final judgment under this Court's law relating to general verdicts. .................................................... 52

IV.    If the Court of International Trade reverses or vacates the Remand Results, the final judgment should be vacated. .............. 57

CONCLUSION .................................................................... 59

# TABLE OF CONTENTS
(continued)

*Page*

STATEMENT OF RELATED CASES ....................................................... 60

FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS ............... 61

CERTIFICATE OF SERVICE ................................................................. 62

# TABLE OF AUTHORITIES

*Page*

**Cases**

*AMS Associates, Inc. v. United States*,
  737 F.3d 1338 (Fed. Cir. 2013)..........................................................31

*U.S. ex rel. Bahrani v. Conagra, Inc.*,
  465 F.3d 1189 (10th Cir. 2006) ..........................................................26

*BMW of N. Am. LLC v. United States*,
  926 F.3d 1291 (Fed. Cir. 2019)..........................................................27

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
  637 F.3d 1047 (9th Cir. 2011) ..........................................................24

*Chang v. Accelerate Diagnostics, Inc.*,
  2016 WL 3640023 (D. Ariz. Jan 28, 2016) ................................49-50

*U.S. ex rel. Complin v. N.C. Baptist Hosp.*,
  818 F. App'x 179 (4th Cir. 2020) ...............................................42, 43

*Dang v. Cross*,
  422 F.3d 800 (9th Cir. 2005) ..........................................................21

*U.S. ex rel. Donegan v. Anesthesia Assocs. of Kan. City, PC*,
  833 F.3d 874 (8th Cir. 2016) ....................................................40, 42

*EEOC v. Go Daddy Software, Inc.*,
  581 F.3d 951 (9th Cir. 2009) ..........................................................21

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)...............................................................41–42

# TABLE OF AUTHORITIES
(continued)

*Page*

*U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.*,
  No. CV-12-08193-PCT-PGR, 2015 WL 1522174 (D.
  Ariz. Apr. 2, 2015), *clarified on denial of
  reconsideration sub nom. United States Hamilton v.
  Yavapai Cmty. Coll. Dist.,* No. CV-12-08193-PCT-PGR,
  2015 WL 6468211 (D. Ariz. Oct. 27, 2015) ................................... 25

*Herrgott v. United States Dist. Court for the N. Dist. of Cal. (In re
Cavanaugh)*,
  306 F.3d 726 (9th Cir. 2002) ........................................... 33

*In re Bard IVC Filters Prod. Liab. Litig.*,
  969 F.3d 1067 (9th Cir. 2020) ......................................... 21

*In re Long*,
  478 B.R. 441 (Bankr. D. Colo. 2012) ................................. 38

*Int'l. Brotherhood of Teamsters v. NASA Services, Inc.*,
  957 F.3d 1038 (9th Cir. 2020) ......................................... 49

*Jenkins v. Union Pac. R.R. Co.*,
  22 F.3d 206 (9th Cir. 1994) ........................................... 21

*Jones v. Williams*,
  297 F.3d 930 (9th Cir. 2002) ..................................... 21, 45

*Kern v. Levolor Lorentzen, Inc.*,
  899 F.2d 772 (9th Cir. 1990) ......................................... 52

*Knapp v. Ernst & Whinney*,
  90 F.3d 1431 (9th Cir. 1996) ......................................... 52

*Lesnik v. Eisenmann SE*,
  374 F. Supp. 3d 923 (N.D. Cal. 2019) ............................... 25

# TABLE OF AUTHORITIES
(continued)

*Page*

*U.S. ex rel. Martinez v. KPC Healthcare Inc.*,
    No. 815CV01521JLSDFM, 2017 WL 10439030 (C.D.
    Cal. June 8, 2017) .............................................................. 26

*Maryland v. Baldwin*,
    112 U.S. 490 (1884) .......................................................... 52

*U.S. ex rel. McGrath v. Microsemi Corp.*,
    690 F. App'x 551 (9th Cir. 2017) ......................... 40, 41, 42

*Michaels Stores, Inc. v. United States*,
    766 F.3d 1388 (Fed. Cir. 2014) ....................................... 28

*U.S. ex rel. Morton v. A Plus Benefits, Inc.*,
    139 F. App'x 980 (10th Cir. 2005) ................................... 58

*Portland Feminist Women's Health Ctr. v. Advoc. for Life, Inc.*,
    62 F.3d 280 (9th Cir. 1995) ....................................... 52–53

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ................................... 40–41

*U.S. ex rel. Rostholder v. Omnicare, Inc.*,
    745 F.3d 694 (4th Cir. 2014) ................................... 42–43

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) .................................................. *passim*

*Satellite Broad. Co. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987) ............................................ 41

*U.S. ex rel. Schutte v. SuperValu Inc.*,
    9 F.4th 455 (7th Cir. 2021) ....................................... 40, 42

# TABLE OF AUTHORITIES
(continued)

*Page*

*U.S. ex rel. Sheldon v. Allergan Sales, LLC*,
24 F.4th 340 (4th Cir. 2022), *en banc* review granted,
2022 WL 1467710 (4th Cir. May 10, 2022) .................................... 40

*U.S. ex rel. Streck v. Allergan, Inc.*,
746 F. App'x 101 (3d Cir. 2018) ................................................. 40, 42

*Sunpreme Inc. v. United States*,
946 F.3d 1300 (Fed. Cir. 2020)........................................................ 31

*Thomason v. United States*,
184 F.2d 105 (9th Cir. 1950) ........................................................... 36

*Torrington Co. v. United States*,
68 F.3d 1347 (Fed. Cir. 1995)................................................... 27–28

*Traver v. Meshriy*,
627 F.2d 934 (9th Cir. 1980) ..................................................... 52, 56

*United States v. Bornstein*,
423 U.S. 303 (1976)......................................................................... 39

*United States v. Bourseau*,
531 F.3d 1159 (9th Cir. 2008) ................................................... 25, 26

*United States v. Great Neck Saw Mfrs., Inc.*,
311 F. Supp. 3d 1337 (Ct. Int'l Trade 2018) ............................ 35, 36

*United Steel & Fasteners, Inc. v. United States*,
947 F.3d 794 (Fed. Cir. 2020)................................................... 29–30

*United States v. Vandewater Int'l, Inc.*,
No. 2:17-cv-04393, 2020 WL 4372115 (C.D. Cal June 23,
2020) ..................................................................................... 8, 14, 43

# TABLE OF AUTHORITIES
(continued)

*Page*

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
   579 U.S. 176 (2016) ............................................................. 39

*Vandewater Int'l, Inc. v. United States*,
   476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020) ............... 10, 42, 43–44

*U.S. ex rel. Vigil v. Nelnet, Inc.*,
   639 F.3d 791 (8th Cir. 2011) ......................................... 25

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ................................... 21, 45

*Zhang v. Am. Gem Seafoods, Inc.*,
   339 F.3d 1020 (9th Cir. 2003) ....................................... 16

## Statutes

19 U.S.C. § 1500 ............................................................... 34

19 U.S.C. § 1514 ......................................................... 34, 35

19 U.S.C. § 1592 ......................................................... 35, 36

19 U.S.C. § 1592(a)(1) ...................................................... 35

19 U.S.C. § 1671 .......................................................... 5, 27

19 U.S.C. § 1673 ............................................................... 27

19 U.S.C. § 1677 .......................................................... 5, 27

19 U.S.C. § 1677(1) ......................................................... 27

28 U.S.C. § 1291 ............................................................... 3

28 U.S.C. § 1331 ............................................................... 3

## <u>TABLE OF AUTHORITIES</u>
(continued)

<u>*Page*</u>

31 U.S.C. § 3729 ............................................................................... 1, 3

31 U.S.C. § 3729(a) .............................................................................. 18

31 U.S.C. § 3729(a)(1)(c) ..................................................................... 13

31 U.S.C. § 3729(a)(1)(G) ............................................ 1, 13, 18, 22, 24, 35

31 U.S.C. § 3729(b)(1)(A) ............................................................... 18, 39

31 U.S.C. § 3729(b)(1)(B) ..................................................................... 18

31 U.S.C. § 3729(b)(3) ....................................................... 22, 25, 26, 33

31 U.S.C. § 3730(b)(1) ......................................................................... 18

31 U.S.C. § 3730(b)(2) ......................................................................... 18

31 U.S.C. § 3730(b)(4) ......................................................................... 18

31 U.S.C. § 3730(d)(2) ......................................................................... 18

31 U.S.C. § 3732(a) ............................................................................... 3

31 U.S.C. § 3733 ............................................................................... 1, 3

### <u>Rules and Regulations</u>

19 C.F.R. § 159.1 (2018) ........................................................................ 6

19 C.F.R. § 351.102(b)(50) (2018) .......................................................... 6

19 C.F.R. § 351.225 (2018) .............................................................. 19, 28

19 C.F.R. § 351.225(f)(4) (2018) ........................................................... 20

# TABLE OF AUTHORITIES
(continued)

*Page*

19 C.F.R. § 351.225(k)(1) (2018) .................................................. 9

19 C.F.R. § 351.225(k)(2) (2018) ............................................ 9, 14

19 C.F.R. § 351.225(l) (2018) ............................................... 31, 32

19 C.F.R. § 351.225(l)(3) (2018) ..................................... 20, 29, 37

Fed. R. Civ. P. 50(a) ..................................................... 17

Fed. R. Civ. P. 50(b) ................................................... *passim*

Fed. R. Civ. P. 54(b) ..................................................... 3,17

## Other Authorities

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27296 (May 19, 1997)................................... 30

*Antidumping Duty Order and Amendment; Certain Butt-*
    *Weld Pipe Fittings from China,*
    57 Fed. Reg. 29702 (July 6, 1992).................................... 6

*Antidumping Duty Order: Certain Carbon Steel Butt-Weld*
    *Pipe Fittings from Taiwan,*
    51 Fed. Reg. 45152 (December 17, 1986) ........................ 43

Dan B. Dobbs, Dobbs and Roberts's Law of Remedies,
    Damages, Equity, Restitution (3d ed. 2017)................... 36

Lawrence M. Segan, Note, *Deemed Liquidation: Whose Rate*
    *is this Anyway,*
    10 Fordham Int'l L.J. 689 (1986) ..................................... 34

## **INTRODUCTION**

This appeal presents the bewildering scenario where Appellant Sigma Corporation ("Sigma") has been held liable to Relator, Island Industries, Inc. ("Island"), under the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA") despite the fact that the United States Department of Commerce ("Commerce") has determined that the customs duties at issue are not due and owing. That is, Sigma faces a judgment of three times $8,085,546.03 for a failure to pay customs duties when Commerce has determined that it cannot seek those customs duties from Sigma.

The FCA creates a right of action, but does not create the underlying obligation that is a necessary element of the action. The action it creates is against a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government . . . ." 31 U.S.C. § 3729(a)(1)(G). Here, the alleged obligation arises from statutes and regulations administered by Commerce. Because Commerce has determined that it cannot retroactively order the assessment of antidumping duties for welded outlets that were imported before October 30, 2020, Sigma has no "obligation" to pay antidumping duties and, as a

result, cannot be found liable under the FCA. Commerce's determination also means that antidumping duties on entries before October 30, 2020, cannot be legally cognizable damages.

Moreover, because Sigma had an objectively reasonable belief that customs duties were not owed, it did not act with the intent required for FCA liability. Under the FCA, a defendant cannot act "knowingly" as a matter of law, if it bases its actions on an objectively reasonable interpretation of the relevant regulatory order when it has not been warned away from that interpretation.

Here, before this case was tried in the district court, the Court of International Trade ("CIT") had already effectively determined that Sigma's belief was objectively reasonable, as it had ruled that the antidumping order at issue did not plainly apply to the imported welded outlets. Notwithstanding the CIT's decision, the district court refused to apply the objective reasonableness standard as a matter of law *and* it refused to instruct the jury on the principle.

As will be shown below, there is no viable basis to uphold the jury's verdict and the final judgment should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under the False Claims Act, 31 U.S.C. §§ 3729–3733. *See* 31 U.S.C. § 3732(a). The district court also had jurisdiction under 28 U.S.C. § 1331.

On December 10, 2021, the district court denied Sigma's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) before the district court had entered a final judgment on the jury verdict in favor of Island. Sigma filed a timely notice of appeal from that ruling on January 7, 2022, in an abundance of caution. Then, on February 8, 2022, the district court entered the final judgment, pursuant to Federal Rule of Civil Procedure 54(b), determining that there was no just reason for delay. Sigma appealed the final judgment by filing a timely amended notice of appeal on March 4, 2022.

Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

**Issue 1:**    Whether Island's claim under the FCA fails as a matter of law for lack of an "obligation" to pay the Government money or property when Commerce has expressly ruled that, under the applicable statute and regulation, antidumping duties are not owed on entries predating October 30, 2020.

**Issue 2:**    Whether Island's claim under the FCA fails as a matter of law for lack of damages to the Government when Commerce expressly ruled that, under the applicable statute and regulation, antidumping duties are not owed on entries predating October 30, 2020.

**Issue 3:**    Whether Island's claim under the FCA fails as a matter of law when Sigma's statements that no antidumping duties were owed were objectively reasonable.

**Issue 4:**    Whether Island's alternative product misdescription theory fails as a matter of law or, in the alternative, fails to sustain the final judgment under this Court's law relating to general verdicts.

## STATEMENT OF THE CASE

### A. Statement of the Facts

### 1. Background

Sigma began importing welded outlets from the People's Republic of China ("China") in 2010. 4-ER 573, 693. The two Sigma welded outlets at issue are the Unilet and Safelet products. 4-ER 693–94. Sigma stopped importing welded outlets from China by early 2018. 4-ER 694.

Island, a manufacturer of welded outlets, alleged that the welded outlets that Sigma imported from China were subject to an antidumping duty order issued by Commerce and that Sigma had evaded paying antidumping duties by making false statements to the United States Customs and Border Protection ("Customs" or "CBP"). *See* 2-ER 252–76. Sigma denied those allegations and asserted that its welded outlets were not the so-called butt-weld pipe fittings subject to the antidumping order issued by Commerce. 2-ER 248–50; 4-ER 700–01.

### 2. The 1992 antidumping order and liquidation

In 1992, pursuant to § 735(a) of the Tariff Act of 1930, as amended (19 U.S.C. §§ 1671–1677) (the "Tariff Act"), Commerce issued an order imposing antidumping duties on "carbon steel butt-weld pipe fittings"

from China ("1992 Order"). *Antidumping Duty Order and Amendment; Certain Butt-Weld Pipe Fittings from China*, 57 Fed. Reg. 29702, 29703 (July 6, 1992). The 1992 Order states that it applies to:

> [c]arbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form. These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings) . . . ."

*Id.*; *see* 5-ER 984–85.

The amount of duties owed on a product subject to an antidumping duty is determined in a process referred to as liquidation. "'Liquidation' means the final computation or ascertainment of duties . . . or drawback entries" of imported merchandise. 19 C.F.R. § 159.1 (2018). "Suspension of Liquidation" refers to an order preventing or delaying the final computation of customs duties. Suspension can be ordered by Commerce or a court of the United States. 19 C.F.R. § 351.102(b)(50) (2018).

### 3. Sigma's entry packets

When Sigma imported its welded outlets, it prepared entry packets submitted to Customs. Those packets included five documents: (i) the bill of lading; (ii) the packing list; (iii) the commercial invoice; (iv) the Form

7501 declaration; and (v) a Form 3461 entry form. 4-ER 732. Sigma's entry packets were submitted by an outside customs broker, C.H. Powell. 4-ER 758. Island's own witness acknowledged that C.H. Powell is a "reputable customs broker." 4-ER 758.

In one part of the Form 7501, Box 28, the importer was asked to describe the product being imported. 4-ER 753; *see, e.g.*, 5-ER 986, 1014, 1022. The instructions provided by Customs for completing this box expressly state that "[t]he standard definitions from the CBP HTS [Harmonized Tariff Schedule] database are acceptable" for the description of the articles of merchandise. 5-ER 1041; *see* 4-ER 753–54. The term "steel couplings" was taken from words used in the headings in the HTS. 5-ER 1058; *see* 4-ER 671–73.

Sigma identified the proper HTS code and used the phrase "steel couplings" in Box 28 to describe its welded outlets. 5-ER 986, 1014, 1022. Island never contended that Sigma used the wrong HTS code. But Sigma did *not* describe its products solely as "steel couplings" in its entry packets. On commercial invoices, the products were described as welded outlets in the entry packets. 5-ER 989, 1018, 1025. Notably, at no point during trial did Island contend that Sigma should have described its

products with one of the HTS codes for "Butt welding fittings" on Form 7501 or elsewhere in the entry packets.

In fact, there is no evidence that Sigma had actual knowledge of the 1992 Order until late 2017 or early 2018, which was years after nearly all of these entry packets were submitted. *See* 4-ER 573–74, 678. Moreover, there was no evidence at trial that uniform usage of the description "welded outlets" on Form 7501 or elsewhere in the entry packets would have prompted Customs to impose the duties at issue.

### 4.     The 2018 scope inquiry by Commerce

Sigma received a Civil Investigative Demand ("CID") from the Department of Justice in Spring 2018. *See* Doc. 167 at 8 (PDF 14 of 28); 4-ER 674. After receiving the CID, Sigma requested scope rulings from Commerce that the welded outlets it imports from China are not subject to the 1992 Order. *See* Doc. 167 at 8 (PDF 14 of 28); 4-ER 675–76. Vandewater International, Inc. ("Vandewater") and Smith Cooper International ("SCI") also requested scope rulings from Commerce at that time. *See United States v. Vandewater Int'l, Inc.,* No. 2:17-cv-04393, 2020 WL 4372115, *3 (C.D. Cal June 23, 2020).

Sigma argued that welded outlets are different from butt-weld pipe fittings because butt-weld pipe fittings always connect to another pipe with a flat, perpendicular, or single-plane connection. *See id.* A welded outlet, in contrast, is not so limited. *See id.*

Scope proceedings by Commerce can take many different forms. Commerce must first examine the language of the antidumping order at issue and the description of the product in the scope ruling request. If Commerce can determine whether a product falls within the scope of the order based solely on the language of the order, the inquiry ends there. *See id.*

If, however, Commerce determines that the scope language is ambiguous, it proceeds to consider other factors, called the (k)(1) factors. *See* 19 C.F.R. § 351.225(k)(1) (2018). This is called a (k)(1) analysis. Finally, if the (k)(1) factors are not dispositive, Commerce goes on to consider the (k)(2) factors. This process is called the (k)(2) analysis. *See* 19 C.F.R. § 351.225(k)(2) (2018).

Commerce conducted a (k)(1) analysis actors and concluded that the 1992 Order could "be reasonably interpreted to include" the products at issue. Doc. 167-20 at 17 (PDF 18 of 18); 5-ER 1011.

### 5. The Court of International Trade ruling

Vandewater, SCI, and Sigma challenged Commerce's scope ruling by filing complaints in the CIT, an Article III Court with exclusive jurisdiction over such a challenge to Commerce's scope ruling. The CIT stayed the Sigma proceeding pending the resolution of the *Vandewater* proceeding. Following briefing on the merits, the CIT issued a decision concerning the *Vandewater* proceeding on October 16, 2020.

In *Vandewater*, the CIT found that the "(k)(1) sources Commerce relied upon as dispositive (the King Scope Ruling, the petition language, and the language from the ITC sunset review) do not really tell the court anything about the inclusion of steel branch outlets within the scope of the Order." *Vandewater Int'l, Inc. v. United States*, 476 F. Supp. 3d 1357, 1362 (Ct. Int'l Trade 2020); *see id.* at 1360 ("It is therefore not plainly apparent from the language of the Order whether a steel branch outlet qualifies as a butt-weld fitting covered by the Order or not."). Finding Commerce's scope ruling to be "unreasonable," the CIT remanded the matter to Commerce "to conduct a scope inquiry to evaluate the factors under (k)(2)." *Id.* at 1362.

### 6. The Remand Results

Upon remand of the Vandewater case to Commerce for further proceedings, Commerce initiated a formal scope inquiry as to whether Vandewater's outlets were subject to the 1992 Order. Commerce issued its Final Results of Redetermination Pursuant to Court Remand ("Remand Results") on July 23, 2021. 2-ER 136–239. In that formal scope inquiry under subsection (k)(2), Commerce again determined that welded outlets were within the scope of the 1992 Order.[1] 2-ER 239.

Consequently, Commerce had to decide whether particular entries would be subject to antidumping duties. It decided that only entries on or after the scope inquiry began would be subject to antidumping duties. In the Remand Results, Commerce stated that it "intends to instruct CBP to suspend or continue to suspend entries that entered, or were withdrawn from warehouse, for consumption *on or after* the date of initiation of this scope inquiry." 2-ER 238 (emphasis added).

---

[1] That determination has been challenged by Sigma in the CIT. The issue has been fully briefed and awaits decision. As explained in argument IV below, Sigma preserves its rights to seek to reverse or vacate the final judgment on this additional ground, if the CIT reverses or vacates Commerce's determination that welded outlets were within the scope of the 1992 Order.

Commerce also stated that, "[w]ith respect to entries pre-dating the date of initiation of the inquiry that were suspended pursuant to the instructions issued following the September 10, 2018 Final Scope Ruling, Commerce intends to instruct CBP to *refund cash deposits upon request*...." 2-ER 238 (emphasis added). That is, had Sigma believed that antidumping duties were due and, in turn, had Sigma made cash deposits at the time of importing its welded outlets as an estimate of the antidumping duties that might be eventually liquidated, Commerce would now refund those cash deposit amounts in the light of the Remand Results.

Commerce then made the following important statement with respect to entries "pre-dating the date of initiation" of its scope inquiry: "In the event that the Court's final judgment is not appealed or is upheld on appeal, Commerce intends to instruct CBP to lift suspension of liquidation *and liquidate such entries without regard to antidumping duties*." 2-ER 238 (emphasis added). Thus, after a complicated and lengthy formal (k)(2) analysis, Commerce determined that the 1992 Order does apply to Vandewater's steel branch outlets, but Commerce also determined that its (k)(2) scope ruling is to be applied prospectively

-12-

only, and not retroactively to prior entries. Given the procedural posture of the Vandewater, SCI, and Sigma cases in Commerce and CIT, the Remand Results naturally will apply to Sigma, as well.

### B. Course of relevant proceedings in the district court

On June 13, 2017, Island filed its FCA Complaint against Vandewater, Neil Ruebens, Anvil International, LLC ("Anvil"), Sigma, SCI, and Allied Rubber & Gasket Company ("ARGCO") under seal and gave notice to the United States Department of Justice ("DOJ"). Doc. 1. The DOJ did not intervene in the lawsuit (Doc. 28) and, in early 2019, Island's FCA lawsuit was unsealed. Doc. 34.

On July 10, 2019, Island filed a First Amended Complaint alleging: (1) violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) and (2) conspiracy to violate the FCA, 31 U.S.C. § 3729(a)(1)(c). 2-ER 252–77. The action was a so-called "reverse false claim," in which the allegation is that the defendant unlawfully retained money it should have paid the Government. The money that allegedly should have been paid represented antidumping duties imposed under the Tariff Act. All defendants except ARGCO moved to dismiss and the district court granted the motion in part, dismissing Island's conspiracy claim without

prejudice. Doc. 128. Sigma asserted a statute-of-limitations affirmative defense. 2-ER 250. Island did not file a Second Amended Complaint.

Sigma (and other defendants) moved for summary judgment before the CIT remanded the Vandewater case and before the Remand Results were issued. Docs. 167, 169, 172. The district court denied Sigma's motion. *See Vandewater Int'l, Inc.,* No. 2:17-cv-04393, 2020 WL 4372115, at \*10–\*11.

In its summary judgment motion, Sigma raised the issue of objective reasonableness, citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). Doc. 167 at 15–17. Sigma argued that the 1992 Order "is susceptible to more than one reasonable interpretation." *Id.* at 17. "Thus, Sigma's belief that no antidumping duties were owed on its merchandise was (and is) objectively reasonable." *Id.* The district court held that a genuine dispute existed as to whether "Defendants were 'warned away' from their interpretation of the [1992 Order]." *See Vandewater Int'l, Inc.,* No. 2:17-cv-04393, 2020 WL 4372115, at \*10.

The court's summary judgment decision did not address a formal scope ruling by Commerce under 19 C.F.R. § 351.225(k)(2) (2018) ("k(2)") or the Remand Results because neither had occurred at the time of the

district court's ruling. To address those issues that were not encompassed in the district court's summary judgment order, Sigma promptly filed an *ex parte* application for summary judgment within days after Commerce issued the Remand Results. Doc. 392. The district court declined to entertain that application, even though Sigma had no prior opportunity to argue the legal effects of the (k)(2) determination or the Remand Results. Doc. 409.

Sigma was the only defendant in the case that proceeded to trial. The parties filed trial briefs. Docs. 401, 404. Citing the *Safeco* standard, Sigma emphasized that it intended to present evidence that would establish the objective reasonableness of its beliefs and actions. Doc. 401 at 1. It explained that it would present evidence of its importation compliance policies and procedures; the uses and applications of Sigma's Unilet and Safelet products in the fire protection industry; and standards and practices as to butt-weld pipe fittings within the industry. *Id.* at 2.

Sigma also proposed a special jury instruction on objective reasonableness. 2-ER 95–96. Island objected to that proposed special instruction and argued, in relevant part, that "*Safeco* is inapplicable to False Claims Act cases, which apply different statutory language with a

more expansive view of scienter." 2-ER 97. Island continued: "In any event, even in actions where *Safeco* is potentially applicable—that is, in claims under the Fair Credit Reporting Act—the question of whether defendants adopted an objectively reasonable interpretation is a question of law for the Court." 2-ER 97.

A jury trial ensued. The district court instructed the jury that Sigma made a false statement that antidumping duties were not owed, but the court did not instruct the jury that Commerce does not consider those duties to be due and owing. *See* 2-ER 13–35. The district court precluded Sigma from developing evidence of Commerce's non-retroactivity determination on page 103 of the Remand Results. *See*, *e.g.*, 4-ER 649, 688. Moreover, the district court did not give Sigma's proposed instruction on objective reasonableness and did not otherwise explain the *Safeco* objective reasonableness standard to the jury.

The jury returned a general verdict in favor of Island in the amount of $8,085,546.03 and rejected Sigma's affirmative defense.[2] 2-ER 11–12.

---

[2] On the nature of general verdicts, see *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003).

Sigma filed motions under Federal Rules of Civil Procedure 50(a) and 50(b) and an alternative request for a new trial. Docs. 418, 430.

The district court denied Sigma's Rule 50(b) motion (and alternative request for a new trial) and, in doing so, ruled that non-retroactivity was not an issue of law but instead an issue for the jury. 1-ER 4–9. The district court entered its ruling denying the 50(b) motion before it entered a final judgment. In an abundance of caution, Sigma filed a timely notice of appeal from that order. 5-ER 1061–62.

Then, on February 8, 2022, the district court entered the final judgment. 1-ER 2–3. The final judgment included $24,256,638.09 as treble damages under the False Claims Act and $1,824,145.00 in civil monetary penalties. 1-ER 3. The court determined that there was no just reason for delay and entered final judgment against Sigma pursuant to Federal Rule of Civil Procedure 54(b). 1-ER 3. The court retained jurisdiction over statutory expenses, attorneys' fees, and costs. 1-ER 3.

Sigma appealed the final judgment by filing a timely amended notice of appeal. ER 1059-60. Sigma has also secured a supersedeas bond to secure the final judgment pending appeal and the district court entered a stay. Doc. 465.

## **STATUTORY AND REGULATORY BACKGROUND**

The FCA imposes liability if a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation . . . to the Government" or "knowingly conceals or knowingly and improperly avoids or decreases an obligation . . . to the Government." 31 U.S.C. § 3729(a)(1)(G). The FCA defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A). It "require[s] no proof of specific intent to defraud." § 3729(b)(1)(B).

The FCA allows private individuals known as relators to bring *qui tam* actions "for the person and for the United States Government." § 3730(b)(1). The United States can choose to intervene in the relator's action if it wishes. § 3730(b)(2), (4). When, as here, the Government declines to intervene, the relator generally receives 25–30% of any proceeds of the action, plus attorneys' fees and costs. § 3730(d)(2). If an FCA action succeeds, defendants are liable for treble damages as well as a civil penalty of up to $10,000 per claim. § 3729(a).

Sometimes Commerce has to determine whether a particular product falls within the scope of an antidumping order, and Commerce has a regulation that addresses scope rulings. The introduction (subsection (a)) to that regulation reads as follows:

> (a) *Introduction*. Issues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation. Such issues can arise because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms. At other times, a domestic interested party may allege that changes to an imported product or the place where the imported product is assembled constitutes circumvention under section 781 of the Act. When such issues arise, the Department issues "scope rulings" that clarify the scope of an order or suspend investigation with respect to particular products. This section contains rules regarding scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation.

19 C.F.R. § 351.225 (2018).

The regulation then goes on to describe the difference between the factors to be considered in a (k)(1) scope inquiry and a (k)(2) scope inquiry:

> (k) *Other scope determinations*. With respect to those scope determinations that are not covered under paragraphs (g) through (j) of this section, in considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary will take into account the following: (1) The descriptions of the merchandise

-19-

contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission. (2) When the above criteria are not dispositive, the Secretary will further consider: (i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertise and displayed.

*Id.*

When Commerce conducts a (k)(2) analysis, it "will issue a final ruling as to whether the product which is the subject of the scope inquiry is included within the order . . . ." 19 C.F.R. § 351.225(f)(4) (2018). If Commerce "issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) will continue." 19 C.F.R. § 351.225(l)(3) (2018). "Where there has been no suspension of liquidation, [Commerce] will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry." *Id.*

## STANDARD OF REVIEW

This Court reviews the district court's denial of a renewed motion for judgment as a matter of law under Rule 50(b) de novo. *EEOC v. GoDaddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). The evidence must be viewed in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Purely legal questions, even those from the court's denial of summary judgment, are reviewed de novo. *See In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067, 1072–73 (9th Cir. 2020).

This Court reviews arguments that the jury instructions misstated the law de novo. *See Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005). "Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002). "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citing *Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994)).

## SUMMARY OF THE ARGUMENT

Commerce has determined that it cannot retroactively order the assessment of antidumping duties for welded outlets that were imported prior to October 2020. Accordingly, Sigma has no "obligation" to pay antidumping duties on those outlets and, as a result, cannot legally be found liable under the FCA.

Commerce's Remand Results have direct ramifications for the viability of Island's FCA claim. Under 31 U.S.C. § 3729(a)(1)(G), an FCA violation requires a false statement "material to an obligation to pay or transmit money or property to the Government . . . ." Under 31 U.S.C. § 3729(b)(3), the term "obligation" is defined with reference to an applicable "statute or regulation." Here, the applicable statutes and regulations are administered by Commerce, and Commerce's Remand Results establish that Sigma did not and does not have any "obligation to pay or transmit" duties under the 1992 Order.

Beyond confirming the absence of the essential element of an "obligation," Commerce's redetermination also refutes any suggestion that the Government sustained any damages. By deciding that it cannot collect antidumping duties on entries in the relevant time period and, in

fact, will refund any money already collected on such entries, Commerce has decided that such antidumping duties are not a loss.

In addition, as a matter of law Sigma could not act "knowingly" because its actions were consistent with an objectively reasonable interpretation of the 1992 Order, and it was not warned away from that interpretation by any authoritative guidance.

Indeed, the CIT acknowledged that the antidumping order at issue was ambiguous and did not plainly reveal its applicability to the imported products at issue. The fact that a (k)(2) analysis was needed to establish the meaning and scope of the antidumping order highlights that the order was ambiguous and that Sigma's actions are protected by the objective reasonableness principle.

The final judgment cannot be sustained on the basis of Island's product misdescription theory. That theory fails as a matter of law and, at a minimum, a new trial is warranted if a defective theory is submitted to the jury and a general verdict is returned.

The final judgment should be reversed for entry of judgment in Sigma's favor. At a minimum, a new trial should be ordered.

## ARGUMENT

In this case, the FCA has been utilized by Island as a weapon against competitors in the marketplace. To date, one competitor (Vandewater) has filed for bankruptcy protection and Sigma faces a crushing final judgment. For all of the reasons explained below, the FCA has been contorted to allow this outcome. This Court should reverse the final judgment against Sigma and remand for entry of judgment in favor of Sigma or, at a minimum, order a new trial.

## I.    The Remand Results establish that Sigma is entitled to judgment as a matter of law.

### A.    As a matter of law, Sigma did not submit a false record or statement material to an obligation to pay or transmit money or property to the Government.

#### 1.    A reverse FCA claim requires that the defendant have an actual, specific, and current legal obligation to pay the Government.

A reverse FCA claim under 31 U.S.C. § 3729(a)(1)(G) requires that the defendant "fraudulently reduc[ed] the amount owed to the government . . . ." *See U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011). Section 3729(a)(1)(G) makes liable a person who "knowingly" uses "a false record or statement material to an *obligation* to pay or transmit money or property to the Government, or

knowingly conceals or knowingly and improperly avoids or decreases an *obligation* to pay . . . the Government." *See Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 939–40 (N.D. Cal. 2019) (emphasis in *Lesnik*).

The statute defines "obligation" as "an *established* duty." 31 U.S.C. § 3729(b)(3) (emphasis added). Thus, "[t]he obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the [FCA], a defendant must have had a present duty to pay money or property . . . ." *U.S. v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008) (quotations omitted). That present duty to pay "must be a specific, legal obligation . . . in the nature of those that give rise to actions of debt at common law for money or things owed." *U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.*, No. CV-12-08193-PCT-PGR, 2015 WL 1522174, at *14 (D. Ariz. Apr. 2, 2015), *clarified on denial of reconsideration sub nom. U.S. ex rel. Hamilton v. Yavapai Cmty. Coll. Dist.,* No. CV-12-08193-PCT-PGR, 2015 WL 6468211 (D. Ariz. Oct. 27, 2015) (quoting *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 801 (8th Cir. 2011)).

## 2. The alleged legal obligation here did not arise from the FCA itself, but from U.S. antidumping law.

The FCA creates the cause of action but does not itself create any present duty to pay. The present duty to pay—the actual, specific, and current legal obligation—comes from another source: "some independent legal duty." *U.S. ex rel. Martinez v. KPC Healthcare Inc.*, No. 815CV01521JLSDFM, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017) (citing *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006)). A number of sources are possible, including a "statute or regulation":

> [T]he term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

31 U.S.C. § 3729(b)(3). Thus, "in order to be subject to the penalties of the [FCA], a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness." *Bourseau*, 531 F.3d at 1169 (quotations omitted).

Here, the Plaintiff's alleged obligation was an antidumping duty imposed pursuant to U.S. customs law. Under the Tariff Act,[3] the federal government can impose antidumping duties on imported goods.

### 3. Under U.S. customs law, Commerce is responsible for issuing antidumping orders.

The agency "charged" with determining whether an antidumping duty must be imposed is Commerce. *BMW of N. Am. LLC v. U.S.*, 926 F.3d 1291, 1294 (Fed. Cir. 2019) (citing 19 U.S.C. § 1673) ("Among its many duties, Commerce is charged with protecting domestic producers from foreign exporters' unfair trade practices. To this end, Commerce must investigate and impose antidumping duties on imported merchandise sold in the United States at less than fair value . . . ."). Title 19 provides that the "administering authority" is the entity that determines if an antidumping duty must be imposed (§ 1673) and that the Secretary of Commerce is the administering authority (§ 1677(1)) (defining "administering authority" as the Secretary of Commerce or officer of the United States to whom the administering authority's responsibility is transferred). In sum, Commerce "is the 'master' of the

---

[3] 19 U.S.C. §§ 1671–1677.

antidumping laws." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (citations omitted).

The CIT and the Federal Circuit give "substantial deference to Commerce's interpretations of its own regulations unless they are plainly erroneous or inconsistent with the regulation. . . ." *Michaels Stores, Inc. v. U.S.*, 766 F.3d 1388, 1392 (Fed. Cir. 2014). Similarly, this Court must defer to Commerce's interpretation of 19 C.F.R. § 351.225 (2018), under which it concluded that no antidumping duties are owed on entries predating the initiation of the scope inquiry. *See Udall v. Tallman*, 380 U.S. 1, 16 (1965) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order. '. . . [T]he administrative interpretation . . . becomes . . . controlling . . . unless it is plainly erroneous or inconsistent with the regulation.'") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14 (1945)).

### 4. Commerce has determined it will not retroactively assess antidumping duties on welded outlets entered before the initiation of the scope inquiry.

In its "Final Results of Redetermination Pursuant to Court Remand," Commerce concluded that it would instruct Customs to lift

suspension of liquidation and to liquidate entries without assessing antidumping duties on entries *before* October 30, 2020—the day Commerce began the (k)(2) analysis. 2-ER 238 ("Commerce intends to instruct CBP to suspend or continue to suspend entries that entered, or were withdrawn from the warehouse, for consumption *on or after* the date of initiation of this scope inquiry.") (emphasis added)). In short, Commerce determined that the antidumping duties on the earlier entries, which total more than $8 million, cannot be assessed.

That ruling is in accord with 19 C.F.R. §351.225(l)(3) (2018), which precludes applying a formal scope inquiry under (k)(2) retroactively to entries predating the initiation of the (k)(2) analysis. 19 C.F.R. § 351.225(l)(3) (2018) ("[t]he Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption *on or after the date of initiation of the scope inquiry*.") (emphasis added).

In *United Steel & Fasteners*, 947 F.3d 794 (Fed. Cir. 2020), the Federal Circuit stated that "the regulatory history of § 351.225(l)(3) indicates that Commerce intended to limit the reach of retroactive

suspension of liquidation." 947 F.3d at 802. "Prior to promulgating this regulation, Commerce received comments from the public that, after an affirmative scope ruling, Commerce should suspend liquidation for all unliquidated entries, even those that were entered prior to the initiation of a scope inquiry." *Id.* (*citing Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27327–28 (May 19, 1997))." The argument was that "'the Department must view any merchandise that it determines to be within the scope of an order as always having been within the scope' since 'scope rulings only clarify, and do not expand, the scope of an order.'" *Id.* "Commerce, however, did not do this." *Id.* Instead, Commerce "tailored" its scope regulation to limit any new suspension of liquidation to entries made on or after the date of initiation of a scope inquiry. *Id.*

In so doing, Commerce explained that "[s]uspension of liquidation is an action with a potentially significant impact on the business of U.S. importers and foreign exporters and producers." *Id.* Commerce also explained that "when liquidation has not been suspended, Customs, at least, and perhaps the Department as well, have viewed the merchandise as not being within the scope of an order, importers are justified in

relying upon that view, at least until the Department rules other-wise."
*Id. S*ee also *AMS Assocs., Inc. v. U.S.*, 737 F.3d 1338, 1344 (Fed. Cir.
2013), *overruled on other grounds by Sunpreme Inc. v. United States*, 946
F.3d 1300 (Fed. Cir. 2020) (holding that Commerce exceeded its authority
by ordering CBP to retroactively suspend liquidation and collect
estimated antidumping duties on shipments entered prior to scope
review); *Sunpreme Inc.*, 946 F.3d at 1316 (finding that when Commerce
rules that a product falls within the scope of an order, but there has been
no previous suspension of liquidation, a new suspension may only begin
on or after the date of initiation of the scope inquiry).

In sum, Commerce has previously made the regulatory choice to
apply the results of its formal scope rulings on a prospective basis only,
and it adhered to that choice in this particular case.

### 5. There is no obligation under the FCA to pay antidumping duties that Commerce has determined it cannot retroactively assess.

Since Commerce has determined that its scope finding on welded
outlets only has *prospective* effect given the regulations in force at the
time of its determination (*i.e.*, 19 C.F.R. § 351.225(l) (2018)), Sigma has
no "obligation" under the FCA to pay antidumping duties imported before

-31-

October 30, 2020. Given the prospective nature of the Remand Results, there was never an "established duty" for Sigma to pay or transmit antidumping duties between 2010 and early 2018. As a result, Sigma cannot be found liable under the FCA for failure to pay or transmit those antidumping duties. For that reason, Sigma also cannot be found liable for civil monetary penalties springing from that same purported obligation.

The district court made a fundamental error when it framed the inquiry as whether Commerce's regulations on liquidation "limit" the FCA and implicitly disparaged the liquidation process as a mere "regulatory scheme" that cannot "limit a statute that Congress passed." 1-ER 7 ("The court rejects Sigma's argument and finds that Commerce's regulatory scheme regarding the 'suspension of liquidation' (19 C.F.R. § 351.225(l)) does not preclude FCA liability . . . Congress designed the FCA to prevent and punish fraud against the Government . . . [Liquidation's] laws are administrative, found in the Code of Federal Regulations . . . Commerce's regulatory scheme for liquidating duties should not—and does not—limit a statute that Congress passed to punish fraud against the United States.").

The district court's reasoning that a mere regulation cannot "limit" the FCA misses the point; the FCA itself says that the necessary obligation can derive from a regulation. Thus, while the purpose of the FCA was indeed "to prevent and punish fraud against the Government," 1-ER 7, that purpose was cabined by text explicitly requiring the existence of an obligation in a separate source such as a "statute or regulation." 31 U.S.C. §3729(b)(3). The FCA's putative purposes cannot override the FCA's own express statutory language. *See Herrgott v. U.S. Dist. Court for the N. Dist. of Cal. (In re Cavanaugh)*, 306 F.3d 726, 731–32 (9th Cir. 2002) ("Congress enacts statutes, not purposes, and courts may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals.").

The statutes and regulations administered by Commerce therefore do not "limit" the FCA, but instead create the basis on which the FCA can be applied. If the FCA existed but the Tariff Act and the related implementing regulations did not, the FCA would not create an obligation to pay an antidumping duty on welded outlets. Nor would the FCA provide a lawful basis for the Government to issue an antidumping order. After all, the FCA is not a customs statute. In other words, the

FCA is not the source of the alleged underlying obligation, but merely the cause of action. In order for an obligation to exist, it must be valid under Commerce's "regulatory scheme" because that is the purported source of the obligation.

In any event, the liquidation process is itself established by statutes, including the Tariff Act. Regulations supply additional detail, but liquidation is not an agency creation. "Customs is required by statute to appraise and classify merchandise, determine the amount of duties to be paid, liquidate the entry, and give notice of such liquidation." Lawrence M. Segan, Note, *Deemed Liquidation: Whose Rate is this Anyway*, 10 Fordham Int'l L.J. 689, 690 (1986) (citing 19 U.S.C. § 1500 (1982)).

Moreover, liquidation is not some mere afterthought to the process of importation and the assessment of duties. "The Customs Courts Act of 1970 merged all decisions regarding value, quantity, classification and amount of duties into a single action, the liquidation." *Id.* at 690 n.8 (citing Pub. L. No. 91-271, § 207, 84 Stat. 274, 284 (codified at 19 U.S.C. § 1514)). "Liquidation is the basis for protest of a Customs' decision. Denial of protest by Customs is grounds for invoking the jurisdiction of

the Court of International Trade (CIT)." *Id.* (citing 19 U.S.C. § 1514; 28 U.S.C. § 1581(a)).

The district court also missed the point when it observed that the customs liquidation process is not a bar to liability for making a materially false statement in violation of 19 U.S.C. § 1592(a)(1), 1-ER 7, and then argued that, by analogy, liquidation is also not a bar to FCA liability. This argument is beside the point because § 1592, a separate statute which is not part of the FCA, does not have the same elements as the FCA. The FCA requires that a party making a materially false statement also have "an obligation to pay or transmit money or property." 31 U.S.C. § 3729(a)(1)(G). Section 1592, in contrast, expressly states that it is violated "*without regard to* whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee" by the false statement. 19 U.S.C. § 1592(a)(1) (emphasis added). Thus, a defendant's failure to pay an obligation—which is an element of an FCA claim—is not an element of a § 1592 claim. The district court's citation of *United States v. Great Neck Saw Mfrs., Inc.*, 311 F. Supp. 3d 1337 (Ct. Int'l Trade 2018) and its § 1592 claim is therefore inapposite. The FCA claim here requires

the existence of an obligation to pay specific antidumping duties; the §
1592 violation in *Great Neck Saw* did not.

### B. As a matter of law, the Government did not sustain any damages.

#### 1. Damages cannot include antidumping duties Commerce has determined that it cannot not assess.

All of Island's claimed damages were based on antidumping duties
that Sigma allegedly was obligated to pay but did not. The Remand
Results, however, establish that Sigma had no such obligation, and
therefore the Government has no recoverable damages. Further, even if
this Court were to conclude that Sigma *did* have an "obligation" under
the FCA, Commerce's decision not to assess antidumping duties on
entries before October 30, 2020—the day Commerce began the (k)(2)
analysis—excludes those antidumping duties from Commerce's damages.
Damages "measures . . . the plaintiff's loss." Dan B. Dobbs, Dobbs and
Roberts's Law of Remedies, Damages, Equity, Restitution 374 (3d ed.
2017); *see also Thomason v. United States*, 184 F.2d 105, 107 (9th Cir.
1950) (rejecting "contention [that] overlooks the common usage of the
word 'damages' as meaning compensation in money for any loss or
injury"). By concluding that it cannot assess pre-inquiry antidumping

duties, Commerce has determined that the amounts represented by those antidumping duties are not losses and thus are not damages.

In fact, Commerce itself has agreed that cash deposits made on entries before the scope inquiry will be refunded upon request:

> With respect to entries pre-dating the initiation of the inquiry that were suspended pursuant to the instructions issued following the September 10, 2018 Final Scope Ruling, Commerce intends to instruct CBP to refund cash deposits upon request….

2-ER 238. Sums of money that the Government not only cannot collect but also must refund are not part of damages the Government has sustained, much less damages that should be trebled.

### 2. Regulations in effect years before this case began prevented Commerce from assessing pre-inquiry antidumping duties.

The district court dismissed the relevance of the Remand Results, arguing that the uncollectible antidumping duties are damages because they "were owed on Sigma's entries at the time of importation." 1-ER 7. But as discussed above, Commerce's own regulation (19 C.F.R. §351.225(l)(3) (2018)) prevented Commerce from assessing antidumping duties to entries made before the (k)(2) analysis began, and that regulation took effect in 1997—long before this case began. Before the

time the scope inquiry in this case began, it was already known that a (k)(2) analysis would not allow the Government to collect the antidumping duties at issue. Thus, contrary to the assertion of the district court, antidumping duties were not owed on Sigma's entries at the time of importation.

> ### 3. Even if pre-inquiry antidumping duties had been owed at the time of entry, because they are not currently owed they are not damages.

Moreover, even if the district court were correct about the past, if the antidumping duties are no longer owed *now*, then they are not damages. Money that is no longer owed cannot be damages simply because it was owed at some point in the past. If that were so, then partial repayment of a loss would be irrelevant to the calculation of damages; a party to a contract dispute that paid half the money its opponent demanded would still owe the entire amount of money demanded as damages. But the opposite is true. Partial repayment reduces the ultimate amount of damages. *E.g.*, *In re Long*, 478 B.R. 441, 448 (Bankr. D. Colo. 2012) (noting that "partial repayment . . . does reduce the ultimate amount of damages"). That general principle also applies in FCA cases. In fact, the U.S. Supreme Court has held that an FCA

defendant is entitled to offset damages by any amount paid to compensate the Government for the harm caused by the false claims. *See United States v. Bornstein*, 423 U.S. 303 (1976). Similarly, antidumping duties that the Government agrees are no longer owed are not damages.

## II. Sigma's statements that no antidumping duties were owed were objectively reasonable and Sigma is also entitled to judgment as a matter of law on that basis.

The U.S. Supreme Court has emphasized that the concept of scienter under the FCA must be given "rigorous" application. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192 (2016). The FCA defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), which construes the Fair Credit Reporting Act, has given courts guidance on how to apply the scienter requirement in the FCA. There, the U.S. Supreme Court explained the "objectively reasonable" standard: "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current

thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Id.* at 70 n.20.

Every circuit that has ruled on the issue, including this Court, has determined that the *Safeco* standard also applies to the FCA. *U.S. ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017); *U.S. ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 459 (7th Cir. 2021); *U.S. ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018); *U.S. ex rel. Donegan v. Anesthesia Assocs. of Kan. City, PC*, 833 F.3d 874, 879–80 (8th Cir. 2016); *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 290–91 (D.C. Cir. 2015).[4]

> The *Purcell* court explained as follows:
>
> Strict enforcement of the FCA's knowledge requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability, thereby avoiding the potential due process problems posed by "penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule."

---

[4] A panel of the Fourth Circuit recently came to the same conclusion, but the Fourth Circuit has granted en banc review in that case. *U.S. ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340, 348 (4th Cir. 2022), *en banc review granted*, 2022 WL 1467710 (4th Cir. May 10, 2022).

*Purcell*, 807 F.3d at 287 (quoting *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987)).

In *McGrath*, this Court ruled that the complaint failed to sufficiently plead knowledge where the defendant held a good faith, objectively reasonable interpretation of the regulation under *Safeco*. 690 Fed. App'x at 552. Moreover, under *Safeco*, a defendant's subjective intent is irrelevant: "To the extent that [plaintiffs] argue that evidence of subjective bad faith can support a willfulness finding even when the company's reading of the statute is objectively reasonable, their argument is unsound." 551 U.S. at 70 n.20.

The *Safeco* Court also set forth a two-step analysis, first asking whether a defendant's interpretation was objectively reasonable and then determining whether authoritative guidance might have warned the defendant away from that reading. *Id.* at 69–70.

*Safeco*'s standard requires that defendants must be put on notice before facing liability for allegedly failing to comply with legal requirements. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is

forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Here, the CIT has already effectively determined that Sigma's belief was objectively reasonable, as the 1992 Order was ambiguous and it was "not plainly apparent from the language of the Order whether a steel carbon branch outlet qualifies as a buttweld fitting covered by the Order or not." *Vandewater*, 476 F. Supp. 3d at 1360. The additional "sources Commerce relied upon as dispositive (the King Scope Ruling, the petition language, and the language from the ITC sunset review) do not really tell the court anything about the inclusion of steel branch outlets within the scope of the Order." *Id*. at 1362.

As a matter of law, the objective reasonableness standard precludes a finding of scienter in this case because the 1992 Order was ambiguous. Indeed, this issue is regularly decided as a matter of law. *See McGrath*, 690 F. App'x at 552; *Schutte*, 9 F.4th at 462–72; *Streck*, 746 F. App'x at 105–110; *Donegan*, 833 F.3d at 879–80. The Fourth Circuit has held that a "district court did not err in deciding the issue of [FCA] scienter at the Rule 12(b)(6) motion-to-dismiss stage," *U.S. ex rel. Complin v. N.C. Baptist Hosp.*, 818 F. App'x 179, 183 n.5 (4th Cir. 2020) (citing *U.S. ex*

*rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 703 (4th Cir. 2014)), even when the case involved the question of whether a defendant was warned away from its interpretation, *see id.* at 184 n.6. This is especially appropriate when, as here, whether Sigma has been warned away depends upon the interpretation of legal materials.

Notwithstanding, in its order on summary judgment, the district court noted that there was a genuine dispute as to whether the defendants were "warned away." *See Vandewater Int'l, Inc.,* No. 2:17-cv-04393, 2020 WL 4372115, at *10. At that point, the district court focused upon the so-called Sprink-let order as the authoritative guidance that may have warned Sigma away. *Id.*

In March 1992, Commerce issued a scope decision to Sprink, Inc. that decided that its Sprink-let outlet was within the antidumping order related to butt-weld fittings from Taiwan. *See Antidumping Duty Order: Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 Fed. Reg. 45152 (December 17, 1986).

Yet Commerce has expressly stated that the Sprink-let scope ruling was non-binding in this case. Doc. 167-20 at 16 (PDF 17 of 18); 5-ER 1010. The CIT then confirmed that "Commerce, however, for some reason,

chose to dismiss its Sprink Scope Ruling as non-binding." *Vandewater*, 476 F. Supp. 3d at 1361. The nonbinding Sprink-let scope ruling certainly did not satisfy the transparency and due process concerns that animate Commerce's regulations.

Perhaps realizing that the Sprink-let scope ruling fails to provide authoritative guidance that could have warned away Sigma, the district court shifted gears in denying Sigma's Rule 50(b) motion. There, in contrast to its order denying summary judgment, the district court did not expressly rely upon the Sprink-let ruling in this part of its analysis. Rather, it pointed to the 1992 Order itself as possible authoritative guidance that the jury may have relied upon to support a finding that Sigma was warned away. 1-ER 8. Of course, this is circular reasoning. If, as determined by the CIT, the 1992 Order is ambiguous and fails to reveal its proper interpretation on its face, it makes no sense to say that that very order can be relied upon to warn away Sigma. That is, because it was "not plainly apparent from the language of the [1992 Order] whether a steel carbon branch outlet qualifies as a buttweld fitting covered by the Order or not," that same 1992 Order cannot serve as authoritative guidance to warn away Sigma. If it were otherwise, the

second step of the *Safeco* analysis could eliminate the first step altogether.

It remains only to note that the whole premise that the jury should decide the *Safeco* issue in this case is undermined by the fact that the district court provided the jury no guidance whatsoever as to the existence of this question or how to decide it. To be clear, the jury was not instructed on objective reasonableness and could not decide this issue.

Sigma submitted a proposed special jury instruction on objective reasonableness. 2-ER 95–96. If the jury was expected to consider and determine this issue, Sigma was entitled to have the jury instructed on the issue. *See White,* 312 F.3d at 1012 ("Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading."); *Jones,* 297 F.3d at 934 ("A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence."). But the district court did not instruct the jury on objective reasonableness. In fact, Island objected to Sigma's proposed special instruction on objective reasonableness, stating that "the question of whether defendants adopted an objectively reasonable interpretation is a question of law for the Court." 2-ER 97.

Sigma agrees. Applying *Safeco* and its progeny leads to the conclusion that Sigma is entitled to judgment as a matter of law on this basis.

At bottom, Sigma's understanding that no antidumping duties were due and owing was objectively reasonable and no authoritative guidance existed that would have warned Sigma away from that understanding. As a matter of law, Island failed to establish the scienter element of the FCA. At a minimum, a new trial is necessary to properly instruct the jury on the *Safeco* standard.

**III. Sigma's description of its products did not create a viable basis for liability under the FCA and, in the alternative, the product misdescription theory cannot sustain the final judgment under this Court's law relating to general verdicts.**

If this Court agrees with Sigma on either of its primary points on appeal (arguments I.A or I.B above) the final judgment should be reversed and remanded for entry of final judgment for Sigma. If this Court agrees with Sigma on its *Safeco* objective reasonableness point (argument II above), then this Court has rejected Island's theory that Sigma made false statements regarding no antidumping duties being due and owing, and Sigma is entitled to judgment as a matter of law on that basis. In the district court, Island argued that the general verdict still

could be upheld on its alternative theory that Sigma misdescribed its products in its duty entry packets. But Island is wrong for two reasons.

First, Sigma's Rule 50(b) motion should have been granted on the basis that there was insufficient evidence to establish that Sigma's description of its products in its entry packets created FCA liability. As will be shown below, Sigma's description of its welded outlets followed the authoritative guidance of the Instructions for Form 7501, the HTS codes, and the Star Pipe ruling. For that reason, the product misdescription theory does not provide an alternative basis to sustain the verdict and, when this is considered in conjunction with Sigma's *Safeco* objective reasonableness point (argument II above), the final judgment should be reversed and remanded for entry of judgment as a matter of law in favor of Sigma (the same result that should be obtained if Sigma prevails on either argument I.A or argument I.B above).

Second, at a minimum, the final judgment is due to be reversed and remanded for a new trial under this Court's law related to general verdicts. Because the verdict in this case was a general verdict, not a specific verdict, and because it could have rested on a legally deficient theory—*i.e.*, a theory that ignores the objective reasonableness of Sigma's

belief that no antidumping duties were due and owing—reversal is required.

### A. Sigma's Rule 50(b) motion should have been granted on the basis that no reasonable jury could have found falsity, scienter, or materiality in relation to Sigma's decription of its products in its duty entry packets.

Island contends that Sigma misdescribed its welded outlets in its entry packets and that the asserted product misdescription is actionable under the FCA. Island is mistaken.

At the outset, it bears emphasis that Sigma used the proper HTS code (7307.99.5045) in Box 28 of Form 7501, following authoritative guidance from the Form 7501 instructions and the Star Pipe ruling from Customs. The instructions provided by Customs for completing Box 28 expressly state that "[t]he standard definitions from the CBP HTS [Harmonized Tariff Schedule] database are acceptable" for the description of the articles of merchandise. 5-ER 1041; *see* 4-ER 753–54.

Island acknowledges that it never contended that Sigma used the wrong code. Doc. 434 at 17 (PDF 21 of 22). But Island contends Sigma's use of the term "steel couplings" in the entry packets was false, as it presented evidence that Sigma's welded outlets are not actually "steel couplings." Doc. 434 at 13–14 (PDF 17–18 of 22). Of course, the term

"steel couplings" was taken from the words used in the headings in the HTS, and those headings do not contain the concept or choice of "welded outlets." 5-ER 1058; *see* 4-ER 671–73. Island has not contended that Sigma should have used one of the HTS codes that reference "Butt welding fittings" (*see*, *e.g.*, 7307.93) or that Sigma should have described its products as "butt-welded pipe fittings" or "butt-weld outlets" on Form 7501.

Notably, Sigma did *not* describe its products solely as "steel couplings" in its entry packets. On commercial invoices, the products were described as welded outlets in the entry packets. 5-ER 989, 1018, 1025.

When the entry packets are read as a whole, which is fully consistent with the general legal principle that documents must be read as a whole to be properly understood, Sigma made no false statement. *See*, *e.g.*, *Int'l Brotherhood of Teamsters v. NASA Services, Inc.*, 957 F.3d 1038, 1047 (9th Cir. 2020) (embracing premise that "[t]he whole of a contract is to be taken together. . . ." and stating that this "[f]undamental precept" is "not unique to California"); *Chang v. Accelerate Diagnostics, Inc.*, No. CV-15-00504-PHX-SPL, 2016 WL 3640023, at *8 (D. Ariz. Jan

28, 2016) (evaluating allegedly false statements in the securities context and warning against interpretations that "require[] the reader to look at one statement on the slide and ignore the remainder of the slide and the presentation").

Further, the premise that Sigma knowingly made a false statement in the description of its products is refuted if, as Sigma asserts above in argument II, its understanding that no antidumping duties were owed was objectively reasonable. Sigma would have had no reason to misdescribe its products when its objectively reasonable understanding was that no antidumping duties were owed in any event. In other words, if Sigma believed antidumping duties were not owed, then there is no basis to presume that Sigma was trying to avoid them, and thus no reason to assume that Sigma's use of the term "steel couplings" was part of an effort to avoid them. After all, Sigma's belief that nothing was owed made avoidance unnecessary. Sigma's actions were fully consistent with an objectively reasonable understanding that no antidumping duties were owed and an objectively reasonable reading of the Form 7501 instructions and the Star Pipe decision from Customs (5-ER 1012).

Finally, there is no evidence to establish that Sigma's use of the term "steel coupling" was material to any decision by Customs not to impose antidumping duties.

The Star Pipe ruling undisputedly showed that Customs considered welded outlets to fall under HTS code 7307.99.5045, the code Sigma used, and not the HTS code for butt-weld fittings. 5-ER 1012. There is no evidence that, had Sigma used the term "welded outlet" consistently on the form 7501 in addition to using it on commercial invoices in the entry packets, Customs would have assessed antidumping duties. That is, there is no evidence that uniform usage of the description "welded outlets" would have informed Customs that antidumping duties were owed.

Although Island's expert, Kelli Thompson, testified that, "if an importer falsely described their product using a description of a product that was not covered by an antitidumping order," it would "influence whether Commerce actually collected the antidumping [duty]," 4-ER 735, she did not testify that the description "welded outlets," rather than the description "butt-weld outlets," would have informed Customs that antidumping duties were owed. And she did acknowledge that the

narrative description "steel couplings" (or any other narrative description in that place) was not "a required element" of Form 7501. 5-ER 734.

## B. Island's product misdescription theory cannot sustain the final judgment under this Court's law relating to general verdicts.

As a general rule, a general verdict cannot be sustained when a theory that lacks evidentiary or legal support was improperly submitted to a jury. *See, e.g., Maryland v. Baldwin,* 112 U.S. 490 (1884) (setting forth the general principle); *Kern v. Levolor Lorentzen, Inc.,* 899 F.2d 772, 777 (9th Cir. 1990) (citations omitted) ("As a general rule, a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury.").

Notwithstanding its recognition of the general rule, this Court has also recognized it has discretion to uphold a general verdict even when an improper theory was submitted to the jury. *See Traver v. Meshriy,* 627 F.2d 934, 938 (9th Cir. 1980). But this Court has labeled this discretion a "narrow exception." *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1439 (9th Cir. 1996). In particular, this Court holds that the decision to grant a new trial under the general verdict rule should be guided by four factors:

(1) the potential for confusion of the jury; (2) whether the losing party's defenses apply to the count upon which the

verdict is being sustained; (3) the strength of the evidence supporting the count relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to the various legal theories.

*Portland Feminist Women's Health Ctr. v. Advoc. for Life, Inc.,* 62 F.3d 280, 285-86 (9th Cir. 1995) (quotation omitted).

In this case, the general rule would apply if this issue is reached. As shown in argument II above, Island's theory that Sigma made a false statement that no antidumping duties were due and owing should have been rejected as a matter of law under *Safeco* and objective reasonableness principles. That theory should not have been presented to the jury.

Given the circumstances of that invalid theory being submitted to the jury, the potential for jury confusion was exceedingly high in this case. The district court actually instructed the jury that "Defendant's statements that its welded outlets were not subject to antidumping duties were false." 2-ER 25. That instruction should not have applied to the product misdescription theory, where the jury should have been required to find a false statement. But the potential to be confused as to whether that issue was already decided is obvious. Indeed, at the pre-

trial conference, the district court itself revealed confusion over whether falsity would be at issue at the trial:

> [T]he issue of whether or not there's a false statement or not, or a falsity has been decided in summary judgment. It's also been decided by the scope hearing.

> So the main issue here, and I think everybody agrees, is scienter.

3-ER 282.

This confusion can also be seen in comments by the district court at trial. The district court instructed the jury that "[t]he only question that -- the predominant question that you are going to be asked at the end of this trial is did the defendant know or should they have known that it was subject to this duty." 4-ER 709. The district court also told counsel during trial that "*the whole issue*, as I've said before, is whether or not the defendant knew or should have known." 4-ER 730 (emphasis added).

In turn, the impact of the primary theory that Sigma made false statements about antidumping duties undeniably affected the jury's consideration of the product misdescription theory. Sigma explained that it described its products consistently with authoritative guidance from the Form 7501 instructions and the Star Pipe ruling. Throughout Island's opposition to Sigma's Rule 50(b) motion, Island conflated the argument

that antidumping duties were owed with the argument that Sigma misdescribed its products in a false and material way. For instance, in closing argument Island argued the following:

> Are steel couplings subject to an antidumping duty? No. You know that, too. You've seen the evidence. You've heard it all now. You know that welded outlets are subject to an antidumping duties, but steel couplings are not.

5-ER 914. Then, after trial, continued to conflate the arguments:

> Sigma cannot rely on the Star Pipe CROSS ruling, which only perpetuates the company's extremely deficient antidumping processes: The Star Pipe ruling never mentions antidumping because it is concerned only with the proper HTS classification for welded outlets. Trial Ex. 1007; Day 2 Tr. at 192:10-18. Island never contended that Sigma used the wrong HTS code. Instead, Sigma continues to ignore that HTS classifications do not control the applicability of antidumping duties. . . .

Doc. 434 at 17 (PDF 21 of 22).

Thus, Island expressly commingled the product misdescription inquiry and the antidumping duties inquiry. Yet, if Sigma's understanding that no antidumping duties were owed was objectively reasonable, and no FCA liability may attach for its statements regarding antidumping duties, then the entire complexion of the product misdescription claim changes. There is no reason to believe the jury understood that. The jury's evaluation of the product misdescription

theory was conflated with a theory (Sigma's alleged misstatements as to antidumping duties owed) that should not have been submitted to the jury in the first place.

As to Sigma's statute-of-limitations affirmative defense, Island argued below that "the jury's rejection of Sigma's affirmative defense underscores that it rejected Sigma's argument that the entry packets, when read together, reasonably should have alerted Customs to the fact that Sigma was actually importing welded outlets." Doc. 434 at 14 (PDF 18 of 22). But that of course (i) assumes that the jury was not heavily influenced by being told that falsity was established as a matter of law on the issue of antidumping duties being owed; (ii) misplaces the focus of the scienter inquiry on Customs rather than Sigma; and (iii) ignores the lack of evidence that the uniform use of the term "welded outlets" would have prompted Customs to impose antidumping duties.

It cannot be said that the one of Island's theories is merely derivative of the other. *See Traver,* 627 F.2d at 939. Yet Island's theory that Sigma made a false statement about antidumping duties constituted a significant portion of the proof offered as to the product misdescription theory. The evidence of product misdescription, in the absence of any

considerations regarding false statements as to antidumping duties owed, was not strong and certainly not strong enough to sustain this verdict on its own. In the end, the jury was prevented from considering the product misdescription theory without the confusion created by Island's argument that Sigma knowingly made a false statement about antidumping duties owed.

## IV. If the Court of International Trade reverses or vacates the Remand Results, the final judgment should be vacated.

Sigma sets forth in argument I above that the Remand Results establish as a matter of law that it did not have an obligation to pay antidumping duties on entries prior to October 30, 2020. Notwithstanding, the district court instructed the jury that Sigma made a false statement relating to no antidumping duties being owed and the jury was not asked to decide that issue.

The Court of International Trade is currently considering Commerce's determination as to the scope of 1992 Order. That case is fully briefed. Sigma maintains and has argued that no antidumping duties were owed in connection with the company's importation of Unilet and Safelet between 2010 and 2018. If the Court of International Trade vacates or remands Commerce's determination in the Remand Results as

to the scope of the 1992 Order, that ruling would bear directly on the viability of Island's FCA claim, the correctness of the district's court's jury instruction on falsity, and the sufficiency of the evidence to uphold the jury's verdict. Although Sigma's arguments set forth above provide multiple bases to reverse and vacate the final judgment without regard to the pending proceeding in the CIT, such a decision by the CIT would create another basis for vacating the final judgment. Sigma preserves its position on this point.

To be sure, Sigma preserved this issue in the district court. In its Rule 50(b) motion, Sigma acknowledged that "the Remand Results constitute the currently applicable law," but that "Sigma intends to appeal Commerce's decision and expects to prevail." Doc. 430 at 18 (PDF 24 of 27). In turn, Sigma stated that it "preserves for appeal its argument that it did not make any false claims because whether Sigma's products were subject to antidumping duties is a disputed issue of law." Doc. 430 at 18–19 (PDF 24–25 of 27). Sigma cited *U.S. ex rel. Morton v. A Plus Benefits*, Inc., 139 F. App'x 980 (10th Cir. 2005), asserting that legal contentions resulting from inherently ambiguous issues of fact and law are not a proper basis for a FCA claim. Doc. 430 at 19 (PDF 25 of 27).

If the CIT reverses or vacates the Remand Results as Sigma has requested in its appeal in that court, the fundamental premise of the trial would be upset. In that event, the final judgment should be vacated.

## CONCLUSION

For the foregoing reasons, the Judgment of the District Court should be reversed. The case should be remanded for entry of judgment in favor of Sigma. At a minimum, a new trial should be ordered.

Date: June 2, 2022                    Respectfully submitted,

s/ *Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.
CARLTON FIELDS, P.A.
4221 W. Boy Scout Boulevard
Suite 1000
Tampa, Florida 33607
Telephone: (813) 229-4253
Facsimile: (813) 229-4133
jlang@carltonfields.com

Michael L. Yaeger
CARLTON FIELDS, P.A.
405 Lexington Avenue, 36th Floor
New York, New York 10174
Telephone: (212) 785-2577
Facsimile: (212) 785-5203
myaeger@carltonfields.com

*Attorneys for Appellant*
*Sigma Corporation*

## <u>STATEMENT OF RELATED CASES</u>

Sigma Corporation is not aware of any related case pending in the Ninth Circuit. An appeal of the Remand Results is pending in the Court of International Trade.

Date: June 2, 2022

CARLTON FIELDS, P.A.

<u>*s/ Joseph H. Lang, Jr.*</u>
Joseph H. Lang, Jr.

*Attorneys for Appellant*
*Sigma Corporation*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number**  __22-55063_____

I am the attorney for Sigma Corporation.

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1 because:

   ☒ this brief contains 11,864 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), or

   ☐ this brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook, or

   ☐ this brief has been prepared in a monospaced spaced typeface using (state name and version of word processing program) with (state number of characters per inch and name of type style).

   .

**Signature:** _s/ *Joseph H. Lang, Jr.*_____   **Date:**___June 2, 2022_____

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  June 2, 2022

CARLTON FIELDS, P.A.

s/ *Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.

*Attorneys for Appellant*
*Sigma Corporation*