No. 22-55063

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

ISLAND INDUSTRIES, INC., *et al.*

Plaintiff-Appellee,

v.

SIGMA CORPORATION, *et al.*

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Central District of California

_____

## BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE SUPPORTING APPELLEE AND AFFIRMANCE

_____

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-3159*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES .......................................................................1

STATEMENT OF ISSUES ....................................................................................2

STATEMENT OF THE CASE ...............................................................................2

    A.    The False Claims Act .........................................................................2

    B.    Commerce's Antidumping Duty Orders and Scope Rulings .....................3

    C.    Prior Proceedings ..............................................................................6

SUMMARY OF ARGUMENT ............................................................................. 11

ARGUMENT ................................................................................................... 13

I.    Sigma Had An Obligation To Pay The Government Antidumping
Duties, And The Government Suffered Damages When Sigma Violated
That Obligation ........................................................................................ 13

II.    There Was Sufficient Evidence From Which A Reasonable Jury Could
Conclude That Sigma Acted Knowingly ...................................................... 19

CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ass'n of Flight Attendants-CWA v. Huerta,*
785 F.3d 710 (D.C. Cir. 2015) ........................................................... 25

*Commercial Contractors, Inc. v. United States,*
154 F.3d 1357 (Fed. Cir. 1998) ......................................................... 21

*Cook County v. United States ex rel. Chandler,*
538 U.S. 119 (2003) ...................................................................... 2, 17

*Duferco Steel, Inc. v. United States,*
296 F.3d 1087 (Fed. Cir. 2002) ................................................... 15-16

*Godecke v. Kinetic Concepts, Inc.,*
937 F.3d 1201 (9th Cir. 2019) ......................................................... 21

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
579 U.S. 93 (2016) ............................................................... 22, 22-23

*Safeco Ins. Co. of Am. v. Burr,*
551 U.S. 47 (2007) ........................................... 7, 8, 22, 24, 25

*Siebert v. Gene Sec. Network, Inc.,*
75 F. Supp. 3d 1108 (N.D. Cal. 2014) ...................................... 20, 22

*United States v. Allergan, Inc.,*
746 F. App'x 101 (3d Cir. 2018) ...................................................... 23

*United States v. Bourseau,*
531 F.3d 1159 (9th Cir. 2008) ........................................... 14, 16, 19

*United States v. Chen,*
402 F. App'x 185 (9th Cir. 2010) .................................................... 23

*United States v. Cherry Hill Textiles, Inc.,*
112 F.3d 1550 (Fed. Cir. 1997) ....................................................... 16

*United States v. Mackby,*
261 F.3d 821 (9th Cir. 2001) ..................................................... 20, 22

*United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt, Grp., Inc.,*
400 F.3d 428 (6th Cir. 2005) ........................................................... 17

*United States ex rel. Bahrani v. Conagra, Inc.*,
465 F.3d 1189 (10th Cir. 2006) ............................................................ 17

*United States ex rel. Body v. Blue Cross & Blue Shield of Ala., Inc.*,
156 F.3d 1098 (11th Cir. 1998) ............................................................ 17

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
839 F.3d 242 (3d Cir. 2016) ............................................................... 13

*United States ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*,
833 F.3d 874 (8th Cir. 2016) ............................................................... 23

*United States ex rel. McGrath v. Microsemi Corp.*,
690 F. App'x 551 (9th Cir. 2017) ......................................................... 23

*United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
276 F.3d 1032 (8th Cir. 2002) ............................................................. 21

*United States ex rel. Oliver v. Parsons Co.*,
195 F.3d 457 (9th Cir. 1999) ............................................................... 19

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) ........................................................... 21

*United States ex rel. Purcell v. MWI Corp.*,
807 F.3d 281 (D.C. Cir. 2008) ................................................. 23, 24, 25

*United States ex rel. Roby v. Boeing Co.*,
302 F.3d 637 (6th Cir. 2002) ............................................................... 17

*United States ex rel. Schutte v. SuperValu Inc.*,
9 F.4th 455 (7th Cir. 2021) ............................................................ 22, 23

*United States ex rel. Sheldon v. Allergan Sales, LLC*,
24 F.4th 340 (4th Cir. 2022), *reh'g en banc granted*,
2022 WL 1467710 (4th Cir. May 10, 2022) ......................................... 23

*United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*,
843 F.3d 1033 (5th Cir. 2016) .............................................................13

*United Steel & Fasteners, Inc. v. United States*,
947 F.3d 794 (Fed. Cir. 2020) ....................................................... 15, 16

*Vandewater Int'l, Inc. v. United States,*
  476 F. Supp. 3d 1357 (Ct. Int'l Trade 2020) ................................................... 7

*Vandewater Int'l, Inc. v. United States,*
  No. 18-cv-00199 (Ct. Int'l Trade Sept. 8, 2022) .................................... 15, 24

## Statutes:

False Claims Act:
  31 U.S.C. § 3729(a)(1) ................................................................................. 3
  31 U.S.C. § 3729(a)(1)(A) ........................................................................... 2
  31 U.S.C. § 3729(a)(1)(G) ............................................... 2, 9, 13, 18, 19
  31 U.S.C. § 3729(b)(1)(A)(i)-(iii) ............................................................. 19
  31 U.S.C. § 3729(b)(1)(B) ......................................................................... 19
  31 U.S.C. § 3729(b)(3) ........................................................................ 9, 13
  31 U.S.C. § 3730(a) ..................................................................................... 3
  31 U.S.C. § 3730(b)(1) ................................................................................. 3
  31 U.S.C. § 3730(b)(2) ................................................................................. 3
  31 U.S.C. § 3730(c)(3) ................................................................................. 3
  31 U.S.C. § 3730(d) ..................................................................................... 3

19 U.S.C. § 1504(a) ......................................................................................... 4

19 U.S.C. § 1505 ...................................................................................... 4, 14

19 U.S.C. § 1673 .............................................................................................. 3

## Regulations:

19 C.F.R. § 141.1(a) .................................................................................. 4, 14

19 C.F.R. § 141.1(b) ....................................................................................... 14

19 C.F.R. § 159.1 .............................................................................................. 4

19 C.F.R. § 351.211(b) ..................................................................................... 4

19 C.F.R. § 351.212(b)(1) ................................................................................ 4

19 C.F.R. § 351.225 .......................................................................................... 5

19 C.F.R. § 351.225(a) ................................................................................... 15

19 C.F.R. § 351.225(k)(1) ................................................................. 5

19 C.F.R. § 351.225(k)(2) ................................................................. 5

19 C.F.R. § 351.225(*l*)(3) (2018) ................................................... 7, 16

**Legislative Materials:**

S. Rep. No. 99-345 (1986) .............................................................. 2, 19

S. Rep. No. 111-10 (2009) ................................................................. 13

**Other Authorities:**

*Antidumping Duties; Countervailing Duties*,
   62 Fed. Reg. 27,296 (May 19, 1997) ........................................ 18

*Antidumping Duty Order and Amendment; Certain Carbon Steel Butt-Weld Pipe
   Fittings from China*, 57 Fed. Reg. 29,702 (July 6, 1992) .............. 3-4, 4, 13-14

*Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*,
   51 Fed. Reg. 45,152 (Dec. 17, 1986) ....................................... 4

W. Page Keeton et al.,
   *Prosser and Keeton on the Law of Torts* § 34 (5th ed. 1984) ......... 22-23

*Knowledge*, Black's Law Dictionary (5th ed. 1979) ........................... 21

*Restatement (Second) of Torts* § 526 (Am. Law Inst. 1977) ................ 21

## INTEREST OF THE UNITED STATES

The False Claims Act is the federal government's primary tool to combat fraud and recover losses due to fraud in federal programs. The United States has a substantial interest in the proper interpretation of the statute.

In this case, a jury returned a verdict against the defendant, concluding that the defendant knowingly failed to pay antidumping duties owed on products it imported between 2010 and 2018. The government has since determined that it can no longer use its administrative mechanisms to collect those duties. On appeal, the defendant argues that the government's inability to collect those duties administratively precludes a finding that the defendant is liable under the False Claims Act. The government has a strong interest in rebutting those arguments, which, if accepted, would create a gaping hole in False Claims Act coverage in this context, effectively immunizing importers from liability even where they knowingly violate clear obligations to pay antidumping duties.

The defendant also argues that it could not have acted knowingly under the False Claims Act because the order that gave rise to its obligations is ambiguous. That argument would mean that a defendant could defeat False Claims Act liability simply by identifying an ambiguity in an applicable requirement, even if the defendant did not actually adopt that interpretation of the requirement when it committed its violations. That reasoning fundamentally distorts the False Claims Act's knowledge requirement.

# STATEMENT OF ISSUES

1.    Whether a defendant can be liable under the False Claims Act for failing to pay antidumping duties and whether the government suffers damages as a result of that failure, when the government has determined that it can no longer collect those duties through its administrative mechanisms.

2.    Whether there was sufficient evidence from which a jury could reasonably conclude that the defendant knowingly made false statements in order to avoid payment of duties owed to the government.

# STATEMENT OF THE CASE

## A.    The False Claims Act

The False Claims Act is "the Government's primary litigative tool" for combatting fraud, S. Rep. No. 99-345, at 2 (1986), and was drafted "expansively[] . . . 'to reach all types of fraud, without qualification, that might result in financial loss to the Government,'" *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). The False Claims Act prohibits both the knowing submission of false claims for payment to the government, *see* 31 U.S.C. § 3729(a)(1)(A), and the knowing avoidance of an obligation to pay money to the United States, *id.* § 3729(a)(1)(G). A person is liable under the latter provision, known as the "reverse" false claims provision, if he "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or if he "knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government."
*Id.* A person who violates the False Claims Act is generally liable to the United States for civil penalties and three times the amount of the government's damages. *Id.* § 3729(a)(1).

The False Claims Act authorizes suits either by the Attorney General or by a private person (known as a *qui tam* relator) in the name of the United States. 31 U.S.C. § 3730(a), (b)(1). If a relator files a *qui tam* action, the government may intervene and take over the case. *Id.* § 3730(b)(2). If the government declines to intervene, the relator conducts the litigation. *Id.* § 3730(c)(3). Monetary proceeds from a *qui tam* suit are divided between the government and the relator. *Id.* § 3730(d).

### B. Commerce's Antidumping Duty Orders and Scope Rulings

**1.** This False Claims Act action stems from efforts of the Department of Commerce (Commerce) to protect domestic businesses from unfair competition by limiting companies' ability to sell foreign goods in U.S. markets at unfairly low prices. As part of those efforts, Commerce is authorized to adopt "antidumping duty" orders that impose tariffs, or duties, on products that it determines are being exported to the United States at a price lower than the cost of production or the sale price in the home or a third country. *See* 19 U.S.C. § 1673.

In 1992, Commerce issued such an order with respect to certain "carbon steel butt-weld pipe fittings" exported from the People's Republic of China (China). *See Antidumping Duty Order and Amendment; Certain Carbon Steel Butt-Weld Pipe Fittings from*

*China*, 57 Fed. Reg. 29,702, 29,703 (July 6, 1992) (1992 Order).  The order defines the covered pipe fittings, in relevant part, by the fact that they are "used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods ( *e.g.*, threaded, grooved, or bolted fittings)."  *Id.*  Commerce had previously adopted an antidumping order covering a materially identical category of products exported from Taiwan.  *See Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 Fed. Reg. 45,152 (Dec. 17, 1986); SER-119.

  2.  When an antidumping order, like the 1992 Order, applies to a particular product, importers of record are responsible for declaring in customs forms that antidumping duties are applicable and must pay estimated duties on the product "at the time of arrival within the Customs territory of the United States."  19 C.F.R. § 141.1(a); *see also* 19 U.S.C. § 1505 ("[T]he importer of record shall deposit with the Customs Service at the time of entry[] … the amount of duties and fees estimated."); 19 C.F.R. § 351.211(b).  Entries that are declared as subject to an antidumping order remain "suspended" from liquidation—*i.e.*, the "final computation or ascertainment of duties," 19 C.F.R. § 159.1—until Commerce calculates a final duty rate and instructs U.S. Customs and Border Protection (CBP) to liquidate the entries, 19 C.F.R. § 351.212(b)(1).  If an entry is not suspended from liquidation, CBP ordinarily must complete liquidation within one year from the date the product entered the country, or the product is deemed liquidated at the estimated rate.  19 U.S.C. § 1504(a).

An importer that is uncertain about whether a particular product is covered by an antidumping order can seek clarification by asking Commerce to initiate a scope inquiry and issue a scope ruling. *See* 19 C.F.R. § 351.225. In issuing a scope ruling, Commerce first considers the factors in 19 C.F.R. § 351.225(k)(1) ((k)(1) factors), which include the language of the antidumping order and prior scope determinations by Commerce. If those factors are not conclusive, Commerce then considers the factors in 19 C.F.R. § 351.225(k)(2) ((k)(2) factors), including considerations such as the ultimate use of the product and the expectations of ultimate users.

**3.** In the 1990s, a company in the business of importing sprinkler system parts from Taiwan asked Commerce to issue a scope ruling about whether its pipe fittings were covered under any applicable antidumping orders. *See* 5-ER-980. The company contended that although the ends of its "Sprink-let" pipe fittings were designed to be welded to other pipes, the pipe fittings nevertheless did not come within the scope of the orders because they also contained threaded or grooved outlets into which sprinkler heads could be screwed. *See* 5-ER-982. Commerce rejected the argument, issuing a publicly available order (Sprink-let Ruling) stating that the definition of butt-weld pipe fittings applies to pipe fittings with beveled edges that are permanently joined through welding, even if the pipe fittings also contain some connections that are not welded. *See* 5-ER-982-83.

### C.   Prior Proceedings

**1.**   In 2010, defendant Sigma Corporation (Sigma) began importing pipe fittings from China.  *See* 4-ER-693.  Those pipe fittings, like the Sprink-let pipe fittings, were made of carbon steel and were generally used to join sections in sprinkler piping systems where conditions required permanent, welded connections though they also contained some threaded or grooved outlets.  3-ER-444.  Sigma described its products as "steel couplings" on customs forms and stated that they were not subject to any antidumping duties.  *See* 4-ER-571-73.

**2.**   Relator Island Industries, Inc., a domestic manufacturer of sprinkler-system parts, filed this *qui tam* suit in 2017 under the reverse false claims provision of the False Claims Act.   Relator alleged that Sigma was falsely stating on customs forms that its pipe fittings were not subject to any antidumping orders to avoid the applicable duties under the 1992 Order.

a.   Shortly after it received a subpoena from the Department of Justice relating to the *qui tam* allegations, and while the case was pending under seal in district court, Sigma requested a scope ruling about whether its pipe fittings were covered by the 1992 Order.  In 2018, Commerce evaluated the (k)(1) factors and determined that the 1992 Order could "be reasonably interpreted to include" Sigma's pipe fittings.  5-ER-1006.  That determination was appealed to the Court of International Trade (CIT), which held that Commerce's ruling on the (k)(1) factors was "unreasonable"

6

and directed Commerce to consider the (k)(2) factors. *See Vandewater Int'l, Inc. v. United States*, 476 F. Supp. 3d 1357, 1362 (Ct. Int'l Trade 2020).

On October 30, 2020, pursuant to the CIT's instructions, Commerce initiated a scope inquiry and analyzed the additional (k)(2) factors. Commerce issued a new scope ruling in 2021, again concluding that Sigma's pipe fittings were within the scope of the 1992 Order. *See* 2-ER-239. Commerce indicated, however, that its determination would have only limited retroactive effect. *See* 2-ER-238. Under the regulations in effect at the time, Commerce was permitted to retroactively order suspension of liquidation while performing a scope inquiry but could do so only for products that entered on or after the date on which the scope inquiry was initiated. *See* 19 C.F.R. § 351.225(*l*)(3) (2018). Accordingly, Commerce's new scope ruling would not allow it to collect duties on the pipe fittings at issue in this case, which entered the United States between 2010 and 2018 and were thus liquidated well before the scope inquiry was initiated in October 2020.

b. Sigma moved for summary judgment in 2020, after Commerce issued its first scope ruling but before the CIT remanded that decision. Sigma argued that: (1) it had not made any false statements in its customs forms because its pipe fittings were not subject to the 1992 Order under a correct interpretation of that order; (2) even if Sigma's statements were false, they could not have been "knowingly" false under *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), because they were consistent with an objectively reasonable interpretation of the 1992 Order; and (3)

because Commerce could not collect antidumping duties for imports that had already been liquidated, no damages could be awarded in a False Claims Act case in connection with those imports.

The district court rejected all three arguments. *See* SER-76-92. As to falsity, the court held that Commerce's 2018 scope ruling definitively established that the 1992 Order applied to Sigma's pipe fittings and thus that Sigma had made false statements when it indicated that the pipe fittings were not subject to any antidumping duties. SER-82-83. Because the scope ruling could only be appealed to the CIT, the district court held that "to the extent [Sigma] argue[d] that this Court should find that Commerce erred in the 2018 Scope Rulings, the Court will not entertain such an argument." SER-83.

As to knowledge, the district court held that the issue could not be resolved on summary judgment. The court first observed that there was a debate over whether *Safeco*, a case interpreting the word "willfully" as used in the Fair Credit Reporting Act, even applied to the False Claims Act. *See* SER-89. But even under *Safeco*, the court observed that "ambiguity in an underlying rule will not negate scienter if the defendant was 'warned away from the view it took' by guidance from the courts or the agency charged with interpreting the rule." *Id.* (quoting *Safeco*, 551 U.S. at 70). The court determined that here, a jury could conclude that the Sprink-let Ruling should have warned Sigma away from an interpretation that treated the 1992 Order as inapplicable to its pipe fittings. *Id.*

8

Finally, the district court held that the fact that the administrative mechanism for collecting antidumping duties would not allow the government to retroactively collect duties owed on Sigma's pipe fittings did not preclude the recovery of damages under the False Claims Act for duties that Sigma should have paid. *See* SER-86-88. The court explained that the administrative process for liquidation is different from the False Claims Act because, instead of preventing and punishing fraud against the government, it "promotes administrative finality" and applies regardless of "the intent of the importer." SER-86. The court also observed that other courts have concluded that administrative mechanisms for collection "are not a bar to recovery under the [False Claims Act]." SER-87. To hold otherwise here, the court reasoned, "would be … at odds with the [False Claims Act's] broad mandate." SER-88.

  c. The case went to trial, and the jury returned a verdict for the relator. *See* 2-ER-11-12. The district court subsequently denied Sigma's motion for judgment as a matter of law. *See* 1-ER-4-9.

  The district court first rejected Sigma's argument that it could not be held liable under the False Claims Act because of the non-retroactive nature of Commerce's 2021 scope ruling. *See* 1-ER-6-8. To be liable under the reverse false claims provision, the court explained, a defendant must have had an "obligation to pay or transmit money or property" to the government. 31 U.S.C. § 3729(a)(1)(G). And the court observed that the statute defines "obligation" as an "established duty, whether or not fixed, arising from … statute or regulation." *Id.* § 3729(b)(3). Sigma

contended that because the 2021 scope ruling had only limited retroactive effect, Sigma could not have had an "obligation" to pay the antidumping duties when it imported its pipe fittings between 2010 and 2018. *See* 1-ER-6-7. The court rejected that argument, holding that "antidumping duties were owed on Sigma's entries at the time of importation" and that "Sigma should have informed Customs that it owed antidumping duties on its imports. By instead informing Customs that its products were *not* subject to antidumping duties, Sigma deprived the Government of money that it was due." 1-ER-7-8.

The district court also rejected Sigma's argument that it was entitled to judgment as a matter of law on the question whether Sigma "knowingly" violated its obligations because the ambiguity of the 1992 Order precluded such a finding. Even under the standard articulated in *Safeco*, the court explained, "[a] jury might still find knowledge if there is interpretive guidance that might have warned [Sigma] away from the view it took." 1-ER-8 (second alteration in original) (quotation marks omitted). The court proceeded to conclude that the evidence was sufficient to justify the jury's verdict. The court pointed to testimony showing that Sigma could have "quickly and easily" obtained "the [1992 Order] and other relevant scope rulings," which would have "'warned [Sigma] away' from stating that its imports were duty-free." *Id.* The court also pointed to evidence that Sigma had described its products as "steel couplings" on customs forms but marketed them as welded outlets—evidence that the court found could "support[] a finding that Sigma deliberately or recklessly ignored

10

the falsity of its statements that its imports were duty-free or were 'steel couplings' instead of welded outlets." *Id.*

Having denied Sigma's motion, the court entered final judgment against Sigma, awarding $24,256,638.09 as treble damages under the False Claims Act. 1-ER-3. Sigma appealed. 5-ER-1059-60.

## SUMMARY OF ARGUMENT

**I.** This Court should affirm the district court's judgment. A person is liable under the reverse false claims provision if he knowingly makes a false statement material to an obligation to pay the government or if he knowingly avoids or decreases that obligation. The 1992 Order and longstanding regulations establish that Sigma owed an obligation to pay antidumping duties on its pipe fittings as soon as it imported them. And yet Sigma declared in its customs forms that its pipe fittings were not subject to any antidumping duties, failed to pay those duties, and deprived the government of monies for nearly a decade as a result. Sigma erroneously suggests that Commerce's inability to collect those duties through its administrative mechanisms is a barrier to relator's claim under the False Claims Act. Courts have repeatedly distinguished between administrative mechanisms designed for routine payment collection and suits to combat fraud under the False Claims Act. If accepted, Sigma's arguments would undermine False Claims Act coverage in this context, effectively immunizing importers from liability even where they knowingly violate obligations to pay antidumping duties.

**II.**   The district court also correctly held that there was sufficient evidence from which a reasonable jury could conclude that Sigma acted knowingly under the False Claims Act.  A defendant acts knowingly if he fails to make simple inquiries that would alert him to the falsity of his statements.  And relator adduced evidence at trial showing that Sigma repeatedly stated that its pipe fittings were not subject to antidumping duties, without making any attempt to find potentially applicable orders or scope rulings or ever consulting with a customs broker.  Indeed, Sigma claimed that it did not even discover the 1992 Order until late 2017 or early 2018, shortly before it stopped importing pipe fittings.

Sigma is incorrect to argue that it could not have acted knowingly because it is reasonable to interpret the 1992 Order as not applicable to Sigma's pipe fittings. Even if that reading is objectively reasonable, there is no evidence that Sigma actually adopted that interpretation when importing its products.  Sigma only learned of the 1992 Order after it had already been importing pipe fittings for almost eight years. And once Sigma discovered the 1992 Order, a jury could reasonably conclude that Sigma knew its pipe fittings were likely covered because it misdescribed them on its customs forms and stopped importing them shortly after it learned of the order.  At that point, moreover, Commerce's publicly available prior scope ruling involving a materially identical product should have warned Sigma away from any contrary interpretation.

# ARGUMENT

**I.**   **Sigma Had An Obligation To Pay The Government Antidumping Duties, And The Government Suffered Damages When Sigma Violated That Obligation**

**A.**      A person is liable under the reverse false claims provision of the False Claims Act if he "knowingly makes[] … a false record or statement material to an obligation to pay … money … to the Government" or if he "knowingly and improperly avoids or decreases an obligation to pay … money … to the Government."  31 U.S.C. § 3729(a)(1)(G).  The False Claims Act defines an "obligation" broadly as an "established duty, whether or not fixed, arising from," among other things, "statute or regulation."  *Id.* § 3729(b)(3).  In enacting that definition, Congress clarified that the False Claims Act applies not only to "fixed liquidated obligations such as judgments" but also to "fixed, unliquidated obligations such as tariffs on imported goods."  S. Rep. No. 111-10, at 14 (2009); *see United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039-40 (5th Cir. 2016) ("[F]ailure to pay customs duties … can give rise to a[] [False Claims Act] claim."); *see United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 254-55 (3d Cir. 2016) (same).

Sigma plainly had an obligation to pay antidumping duties within the meaning of that definition when it imported pipe fittings from China between 2010 and 2018.  That obligation arose from the 1992 Order, which stated that antidumping duties would be applied to certain "carbon steel butt-weld pipe fittings" from China.  57

Fed. Reg. at 29,703. And the obligation accrued as soon as Sigma imported products that were covered by the order. *See* 19 C.F.R. § 141.1(a) ("Duties and the liability for their payment accrue upon imported merchandise … at the time of arrival within the Customs territory of the United States …."); *see also* 19 U.S.C. § 1505 ("[T]he importer of record shall deposit with the Customs Service at the time of entry[] … the amount of duties and fees estimated."). At that point, Sigma had "a personal debt due … to the United States which c[ould] be discharged only by payment in full of all duties legally accruing, unless relieved by law or regulation." 19 C.F.R. § 141.1(b).

It is likewise clear that the government suffered damages as a result of Sigma's failure to pay the antidumping duties it owed. The government's damages in a reverse false claims case "consist of the difference between what the defendant should have paid the government and what the defendant actually paid the government." *United States v. Bourseau*, 531 F.3d 1159, 1172 (9th Cir. 2008). A straightforward application of that rule confirms that the government's damages in this case include all of the unpaid antidumping duties owed on pipe fittings imported from China for which relator demonstrated that Sigma knowingly avoided or decreased the payment owed to the government.

**B.**     Sigma does not dispute, for purposes of this appeal, that its pipe fittings were covered by the 1992 Order.[1]  Nor does it dispute that when a product is covered by an antidumping order, the importer of record must pay duties as soon as those products enter the United States.  Instead, Sigma points to Commerce's statement in its 2021 scope ruling that it would not retroactively order suspension of liquidation for or collect duties on products that entered before October 30, 2020, the date the scope inquiry was initiated.  *See* Opening Br. 29.  According to Sigma, the "*prospective effect*" of Commerce's scope ruling establishes that Sigma was not "obligated" to pay antidumping duties, and the government suffered no loss from its failure to do so, for the products Sigma imported from 2010 until 2018.  *See* Opening Br. 28-31.  That reasoning is fundamentally flawed.

To start, Sigma is wrong to suggest that Commerce's scope ruling has only "prospective effect."  Scope rulings "clarify the scope of an order … with respect to particular products."  *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020) (alteration in original) (quotation marks omitted).  But they do not, themselves, create an obligation to pay antidumping duties.  Rather, "[a] scope ruling that a product is covered by the scope of an order is a determination that the product

---

[1] Sigma and other importers challenged Commerce's determination in the CIT. Although Sigma's challenge remains pending, Sigma intervened in another importer's challenge, and the CIT recently sustained Commerce's determination in that challenge.  *See Vandewater Int'l, Inc. v. United States*, No. 18-cv-00199 (Ct. Int'l Trade Sept. 8, 2022).

has always been covered by the scope of that order." 19 C.F.R. § 351.225(a); *see also*

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). In other words,

the 1992 Order, not the 2021 scope ruling, is the source of any obligation to pay

antidumping duties. Sigma thus "owed a specific, legal obligation" to pay

antidumping duties "at the time" it imported its pipe fittings between 2010 and 2018,

and the government suffered losses as soon as Sigma violated that obligation.

*Bourseau*, 531 F.3d at 1169-70 (quotation marks omitted).

The regulatory process for suspending liquidation and finally assessing duties

following a scope inquiry also does not affect Sigma's liability under the False Claims

Act. When Commerce issued its scope ruling in 2021, Commerce could retroactively

collect additional duties on a product that CBP had not previously suspended only if

that product entered the country on or after the scope inquiry was initiated. *See* 19

C.F.R. § 351.225(*l*)(3) (2018); *see also United Steel & Fasteners*, 947 F.3d 794. Those

regulations brought "finality to the duty assessment process" by limiting Commerce's

ability in the normal course to retroactively collect duties on products that already

have entered the country. *United States v. Cherry Hill Textiles, Inc.*, 112 F.3d 1550, 1559

(Fed. Cir. 1997). But nothing in the regulations purported to change the nature of the

obligation that importers owe under Commerce's standing antidumping orders.

Courts, moreover, have repeatedly distinguished between "administrative

mechanism[s]," like the liquidation process, that facilitate the routine collection of

payments owed to the government and the "remedial mechanism for fraud"

established in the False Claims Act. *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt, Grp., Inc.*, 400 F.3d 428, 456 (6th Cir. 2005) (False Claims Act recovery not limited by Medicare Act's administrative procedures for accounting for underpayments). While the ability of the United States (or a relator) to recover under other administrative or judicial schemes might be limited by damages caps or exhaustion requirements, those limitations do not affect the scope of liability or extent of damages under the False Claims Act. *See, e.g., United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 641-46 (6th Cir. 2002) (False Claims Act recovery not limited by regulatory cap on contract damages); *United States ex rel. Body v. Blue Cross & Blue Shield of Ala., Inc.*, 156 F.3d 1098, 1105-06 (11th Cir. 1998) (False Claims Act action not affected by relator's inability to proceed under administrative framework established by the Medicare Act); *cf. United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) ("The fact that a government official may subsequently waive an established fee does not negate" potential False Claims Act liability.). That is so because Congress intended the False Claims Act to "reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted).

As the district court recognized, Sigma's view undermines that broad mandate by immunizing from liability a wide swath of fraudulent conduct in the importing context. *See* SER-88. Under Sigma's interpretation, importers can lie on customs forms to avoid the assessment of antidumping duties and escape False Claims Act

liability so long as their lies remain undetected through the administrative liquidation period. Given the government's limited resources and the increasing sophistication of importers' fraudulent schemes, agencies are rarely in a position to investigate and file a False Claims Act suit before the close of the liquidation period. Sigma's view would thus create a gaping hole in the government's ability to combat fraud in this context—a result patently inconsistent with the False Claims Act's expansive mandate.

Sigma's citation (at 30-31) to the regulatory history of the liquidation rules only underscores why those rules do not constrain False Claims Act liability. Before promulgating its final rules, Commerce considered a proposal that would have allowed it, following a scope inquiry, to retroactively collect duties on all products with unliquidated duties, regardless of when those products entered the country. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,327-28 (May 19, 1997). In rejecting that proposal, Commerce reasoned that "when liquidation has not been suspended, Customs, at least, and perhaps the Department as well, have viewed the merchandise as not being within the scope of an order, importers are justified in relying upon that view, at least until the Department rules otherwise." *Id.* at 27,328. The same logic, however, has no application in the False Claims Act context, where only those importers who "knowingly" failed to pay the requisite antidumping duties may be held liable. *See* 31 U.S.C. § 3729(a)(1)(G). In short, the False Claims Act does not apply to those importers about whom Commerce was concerned—those who can establish that they relied, in good faith, on a view that their products were not covered

by an antidumping order when they imported them. *See United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999) ("A contractor relying on a good faith interpretation of a regulation is not subject to [False Claims Act] liability[] ….").

## II. There Was Sufficient Evidence From Which A Reasonable Jury Could Conclude That Sigma Acted Knowingly

**A.** To be liable under the False Claims Act, a person must have acted "knowingly"—that is, with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth or falsity" of its statements. 31 U.S.C. § 3729(a)(1)(G), (b)(1)(A)(i)-(iii). "[N]o proof of specific intent to defraud" is "require[d]." *Id.* § 3729(b)(1)(B). Rather, "[i]n defining knowingly, Congress attempted 'to reach … the "ostrich" type situation where an individual has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.'" *Bourseau*, 531 F.3d at 1169 (quoting S. Rep. No. 99-345, at 21).

There was ample evidence from which a reasonable jury could conclude that Sigma acted with at least reckless disregard when it stated that its pipe fittings were not subject to any antidumping duties. At trial, a customs consultant and expert witness explained that responsible importers always search for and then review potentially applicable antidumping orders before declaring on customs forms that their products are not subject to any duties. *See* 4-ER-723-25; 4-ER-727-28; 4-ER-731. But the evidence at trial showed that Sigma failed even to conduct that "limited inquiry." *Bourseau*, 531 F.3d at 1168 (quotation marks omitted). Sigma's executive

vice president, and corporate representative, testified that there were no records of Sigma having searched for, or consulted with anyone about, orders or scope rulings that might apply to its pipe fittings. *See* 4-ER-573-76; 3-ER-491-94. And Sigma's compliance manual did not mention searching for antidumping orders or consulting brokers on potentially applicable duties. *See* 4-ER-737-38. Indeed, Sigma admitted that it did not become aware of the 1992 Order until late 2017 or early 2018—shortly before it stopped importing pipe fittings. *See* 4-ER-573-74. Sigma's complete failure to inform itself of potentially applicable antidumping orders would permit a reasonable jury to conclude that Sigma acted with at least reckless disregard for the truth or falsity of its statements to customs officials. *See United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (defendant acted with at least reckless disregard where he "utterly" "fail[ed] to inform" himself of applicable regulatory requirements (quotation marks omitted)); *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1119 (N.D. Cal. 2014) (defendant acted with reckless disregard where he "never even read the regulations and had no knowledge of them").

**B.**     Sigma contends that this record evidence is all irrelevant because knowledge under the False Claims Act is solely a question of objective reasonableness. *See* Opening Br. 39-43. That standard, Sigma argues, precludes a finding that Sigma acted "knowingly" because the 1992 Order is ambiguous and thus it was objectively reasonable to interpret the order as not applying to Sigma's pipe fittings. *See* Opening Br. 42.

The premise of Sigma's argument—that knowledge can never be established where a legal requirement is ambiguous—is flawed. Ordinary meaning and longstanding precedent establish that each of the False Claims Act's three knowledge provisions may be met even when the legal requirement violated is objectively ambiguous. *See United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) ("Although ambiguity may be relevant to the scienter analysis, it does not foreclose a finding of scienter.").[2] A defendant acts with "actual knowledge" if he subjectively (and correctly) believes that he is violating the requirement. *See, e.g.*, *Knowledge*, Black's Law Dictionary (5th ed. 1979) (*e.g.*, "assurance of fact or proposition … firm belief," "state of mind that one considers that he knows"); *Restatement (Second) of Torts* § 526 (Am. Law Inst. 1977) (A defendant has knowledge of common-law fraudulent misrepresentation if he "knows or believes that the matter is not as he represents it to be."). Similarly, a defendant acts with "deliberate ignorance" if he is subjectively aware of a risk that his statement violates a requirement—for example, because of warnings from attorneys or employees—and buries his head in the sand. *See, e.g.*, *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1211 (9th Cir. 2019). And a defendant acts with "reckless disregard" when he fails to take any steps to ascertain

---

[2] *See also United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (same); *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998) (explaining that, despite ambiguity in contract language, a defendant may be liable based on "evidence of knowledge that the claim is false or of intent to deceive").

and comply with potentially applicable requirements.  *See, e.g.*, *Mackby*, 261 F.3d at 828; *Siebert*, 75 F. Supp. 3d at 1119.

Sigma's reliance on *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), is misplaced.  *Safeco* evaluates different text ("willfully" as opposed to "knowingly"), statutory context (the Fair Credit Reporting Act), and common law background (physical injury torts as opposed to fraud).  *See United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 478-80 (7th Cir. 2021) (Hamilton, J., dissenting), *petition for cert. docketed*, No. 21-1326 (U.S. Apr. 5, 2022).  But even assuming *Safeco* applies in the False Claims Act context, that case addressed a situation where the defendant relied on an objectively reasonable reading of the statute *at the time* of the alleged violations.  *See* 551 U.S. 68-71.  It does not stand for the extraordinary proposition that any post-hoc interpretation developed in subsequent litigation can preclude liability, regardless of whether the defendant actually held that interpretation at the time of the conduct at issue.  Indeed, the Supreme Court expressly rejected that reading of *Safeco* in a later case considering when district courts may impose enhanced damages on patent infringers.  In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016), the Court emphasized that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct" and explained that "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted."  *Id.* at 105-06; *see id.* at 105 (citing W. Page Keeton et al., *Prosser*

*and Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984), for the proposition that the recklessness standard "look[s] to the actor's real or supposed state of mind").[3]

Here, there was no evidence that Sigma—at the time it was importing its pipe fittings—interpreted the 1992 Order as not applying to those products. To the contrary, although Sigma began importing pipe fittings in 2010, Sigma's witnesses testified that Sigma did not discover the order until late 2017 or 2018. *See* 4-ER-573-74. Sigma's executive vice president admitted that he could not "have contemporaneously formed an opinion about what the [1992 Order] covered" before then because he "hadn't seen it" and "couldn't have read it." 4-ER-574. And there was evidence from which a jury could reasonably conclude that once Sigma

---

[3] The cases defendant cites (at 40-41) do not suggest otherwise. The Eighth and D.C. Circuits appeared to assume that the defendant held a reasonable interpretation at the time it submitted its claims. *See United States ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*, 833 F.3d 874, 879-80 (8th Cir. 2016); *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288-90 (D.C. Cir. 2015). The unpublished decisions in this Court and the Third Circuit did not address *Halo* and cited *Safeco* for the uncontroversial proposition that a defendant is not liable for an "innocent, good-faith mistake about the meaning of an applicable rule or regulation." *See United States v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (quotation marks omitted); *United States ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017). Indeed, this Court elsewhere held that even when the defendant identifies a "reasonable interpretation," a jury can find knowledge given "sufficient evidence" that the defendant failed to act "in good faith." *United States v. Chen*, 402 F. App'x 185, 188 (9th Cir. 2010). Only the Fourth and Seventh Circuits have applied *Safeco* in the way Sigma suggests, and each of those cases included forceful dissents. The Fourth Circuit has granted rehearing en banc, and the relator in the Seventh Circuit case has filed a petitioned for a writ of certiorari in the Supreme Court. *See United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340, 344 (4th Cir. 2022), *reh'g en banc granted*, 2022 WL 1467710 (4th Cir. May 10, 2022); *Schutte*, 9 F.4th 455. On August 22, the Court called for the views of the Solicitor General on that petition.

discovered the 1992 Order, it (correctly) interpreted the Order as covering its pipe fittings. Sigma marketed its pipe fittings as "welded outlets," despite describing them in its customs forms as "steel couplings"—a product not covered by the 1992 Order, *see* 3-ER-425-29; 3-ER-507-08, and Sigma stopped importing its pipe fittings altogether shortly after it purportedly discovered the 1992 Order, *see* 4-ER-694.[4]

Moreover, even under *Safeco*, a permissible interpretation of an ambiguous legal requirement is no defense if there is "authoritative guidance" that "might have warned [the defendant] away from the view it took." 551 U.S. at 70; *Purcell*, 807 F.3d at 288-89 (indicating that a defendant that made statements reflecting an incorrect but objectively reasonable reading of an ambiguous provision can be liable under the False Claims Act "if there is interpretive guidance 'that might have warned [the defendant] away from the view it took'" (alteration in original)). The Sprink-let Ruling is such guidance because Commerce there determined that an almost verbatim antidumping order covered pipe fittings materially identical to the ones that Sigma imported. 5-ER-979-83. Any reasonable importer would have concluded based on that ruling that the 1992 Order covered Sigma's pipe fittings. Indeed, one of Sigma's founders testified that he knew from reading the Sprink-let Ruling that Sigma should not be importing Chinese welded outlets without paying duties. *See* 4-ER-667-68.

---

[4] For the same reasons, it is irrelevant that the CIT, in sustaining Commerce's 2021 scope ruling, observed that some of Sigma's post-hoc arguments were reasonable. *See Vandewater Int'l*, No. 18-cv-00199, slip op. at 33.

Sigma protests that the Sprink-let Ruling could not have warned Sigma away because Commerce later stated that the ruling is non-binding in this case. *See* Opening Br. 43 (citing 5-ER-1010). In *Safeco*, the Supreme Court concluded that informal letters from a Federal Trade Commission staff member were not "authoritative" enough "guidance." 551 U.S. at 70 & n.19. But the Court never suggested that guidance must be binding on a particular defendant, like a notice-and-comment regulation or formal adjudication, in order to put the defendant on notice that its practice might be illegal. Indeed, "guidance" documents are often inherently non-binding. *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (describing non-binding policy statements and interpretive rules). So while one agency employee's informal interpretation of a regulatory requirement might not count for much, *see Safeco*, 551 U.S. at 70 n.19; *Purcell*, 807 F.3d at 289 (testimony from former agency employee not authoritative), an agency's considered interpretation memorialized in a final determination, like the Sprink-let Ruling, should properly be understood as sufficiently "authoritative" to be relevant to the knowledge inquiry.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
 */s/ Anna O. Mohan*
ANNA O. MOHAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-3159*

September 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,498 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Anna O. Mohan*
ANNA O. MOHAN

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2022, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system.


*s/ Anna O. Mohan*
ANNA O. MOHAN